CALLAWAY, TRUSTEE, ᴇᴛ ᴀʟ. *v.* BENTON ᴇᴛ ᴀʟ.

No. 21.   Argued October 19, 1948.—Decided February 7, 1949.

*T. M. Cunningham* argued the cause for petitioners. With him on the brief were *A. R. Lawton, Jr., Walter A. Harris* and *Wallace Miller.*

*Charles J. Bloch* argued the cause for respondents. With him on the brief was *Ellsworth Hall, Jr.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

The Central of Georgia Railway Company, whose Trustee is the petitioner here, and its predecessor have leased and operated the property of the South Western Railroad Company since 1869. The Central went into receivership in 1932, and in 1940 entered reorganization under § 77 of the Bankruptcy Act. 49 Stat. 911, 11 U. S. C. § 205. South Western's lease was adopted successively by Central's Receiver and Trustees. It has, in consequence, remained solvent, and no petition for reorganization has ever been filed in its behalf.

Under the plan of reorganization of the Central approved by the Interstate Commerce Commission and by the district court, South Western is given the alternative of selling its property to the reorganized company in return for a fixed amount of bonds of the latter, or of having the lease disaffirmed by the debtor and its property returned.[1] South Western appeared specially

---

[1] With respect to South Western's property, the plan reads as follows: "Prior to or upon consummation of the plan the debtor shall also acquire, if they can be acquired on the terms hereinafter set forth, properties at present leased to the debtor by the South Western Railroad Company . . . . If any of these properties shall not be acquired as a result of the acceptance of the plan by the leased-line security holders, then and in that event the lease or leases of any line or lines not so acquired shall be disaffirmed as of such time at or prior to the consummation of the plan as the court may direct. The method of acquisition, whether through purchase, merger, or consolidation, shall, subject to the approval of the Commission and the

in the reorganization proceedings and asked that its lease be adopted by the reorganized company, but on the basis of studies and estimates not now open to challenge, the Commission rejected the proposal and found that the amount offered for its properties appears "fair and equitable and to equal the value of the transportation property, and [is] approved."[2]

Following Commission and court approval of the plan, South Western's officers, reversing their previous stand, urged acceptance of the offer by its stockholders and signified their intention of conveying the company's property to the Central if a majority of the stockholders voted to accept. Thereupon the respondents, who are individual stockholders of South Western, brought an action in the Superior Court of Bibb County, Georgia, where South Western's principal office is located, asking for an injunction against South Western, its officers and directors, restraining them from certifying the company's acceptance of the offer to the Interstate Commerce Commission or from selling the railroad's property to the reorganized debtor if, upon a vote of the stockholders, a "mere majority" of the stock was voted in favor of the plan. The basis of the petition for injunction was the contention that under the laws of Georgia, where South Western was in-

court, be determined by the trustee or by the reorganization managers when they begin to function.

"If the leased lines are acquired, the railroads of each of the three and the personal property appurtenant thereto and all of the real estate owned by each lessor shall be conveyed to the reorganized company; each of said lessors shall waive any damages to which it has become or shall become entitled on account of any breach of lease; and the South Western Railroad Company shall waive all claims in respect to equipment. Such conveyances and waivers shall in each instance be on the sole consideration of the delivery to each of the respective lessors of the securities proposed to be allocated to it, as hereinafter specified." 261 I. C. C. 501, 515.

[2] 261 I. C. C. 263, 309.

corporated, the entire assets of the company cannot be sold except upon unanimous approval of the stockholders.

Before a decision was reached in the state court action, a meeting of South Western's stockholders was held at which the offer of purchase incorporated in the Central's plan of reorganization was considered. 30,137 shares were voted in favor of acceptance against 9,057 shares favoring rejection. Petitioner, acting as Trustee of the Central, which was not a party to the state court suit, then filed a petition in the bankruptcy court asking that respondents and other stockholders of South Western be enjoined from further prosecution of the state court action, and a temporary restraining order was entered as prayed. Thereupon the state court, of its own motion, entered an interlocutory injunction restraining the officers and directors of South Western from selling its property, on the ground that such a sale under Georgia law requires unanimous consent of the stockholders. Petitioner then amended his petition in the bankruptcy court by bringing to its attention the injunctive order of the state court, and, after holding hearings, the federal district court granted a permanent injunction restraining further prosecution of the state action and declared the state court's temporary injunction null and void as in excess of its jurisdiction. Upon appeal, the Court of Appeals for the Fifth Circuit, one judge dissenting, reversed the order of the district court. 165 F. 2d 877. We granted the petition for a writ of certiorari [3] because of the conflict between state and federal authority and the importance of the question in the administration of the Bankruptcy Act.

*First.* The district court's injunction was based primarily on the premise that the plan of reorganization requires the inclusion of South Western's lines within the

[3] 333 U. S. 853.

system of the reorganized company. The state action is said to be an attempt on the part of respondents "to prevent the consummation of the plan as respects South Western." Again, the court held that "the question of the consolidation, merger and sale, and under what conditions South Western may convey its property to the reorganized Company, in consummation of the plan, is not a question of State law; it is a question of Bankruptcy law—a question which arises under the Bankruptcy Act and the Interstate Commerce Act." The court's conclusion was, therefore, that although the question whether a Georgia railroad corporation can convey all of its properties without unanimous consent of its stockholders would ordinarily be one of state law cognizable in the state's courts, under these circumstances the decision was one for the bankruptcy court applying federal law.

We do not agree. The language of the plan and the factors which the Commission took into consideration in arriving at the amount offered South Western for its properties indicate clearly that, so far as the reorganization plan contemplates acquisition of the lessor railroad, the ordinary rules of offer and acceptance were intended to apply. That has invariably been the practice. As a consequence, we have held that the amount which may be offered a lessor is a question of "business judgment"; that "if the Commission deems it desirable to keep the leased line in the system, it must necessarily have rather broad discretion in providing modifications of the lease where, as here, the lessor is not being reorganized along with the debtor. For under that assumption the modification must be sufficiently attractive to insure acceptance by the lessor or its creditors." *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 550 (1943). The plan itself recites that the leased lines are to be acquired only "if they can be acquired on the

138

terms hereinafter set forth." [4]   Otherwise, the lease is to be disaffirmed and the property returned to the lessor. In addition, the record is replete with statements by the Commission, the court, and the parties that South Western's stockholders are to have the choice open to any offeree: an unfettered right to accept or reject.[5]

Under these circumstances, we can see no reason why the ordinary incidents of a sale of the assets of a corporation should not be applicable.   One of the most important of these is, of course, the question of the proportion of a corporation's stock which must be voted in favor of accepting the offer of purchase in order to make its acceptance effective.   Since, as the district court held, this would ordinarily be a question of Georgia law, we believe that substitution of any other rule of law is erroneous.[6]

---

[4] 261 I. C. C. 515.

[5] In its report approving the plan, the Commission said (261 I. C. C. at p. 308): "The lessor [South Western] insists that it has the right to severance if it cares to exercise it, and such a right will be recognized in the approved plan." The district court, in approving the plan, commented that "If the lessors do not accept the proposal to acquire their lines they are, on disaffirmance, at liberty to take their properties back," while counsel for the Trustee stated at a meeting of South Western's stockholders, "The plan makes an offer to you gentlemen; that is all it does."

[6] This precise problem has received little attention from commentators.   It was not mentioned in the Committee reports or in debate when § 77 and its 1935 amendments were passed.   However, the position of the leased line, a majority of whose stock is not owned by the debtor and which is not in reorganization, is analyzed by Meck, *The Problems of the Leased Line,* 7 Law and Contemp. Prob. 509, 518, as follows: "Upon rejection of the lease, although the leased line remains in the custody of the lessee's trustees, it is not part of the lessee's estate and security holders having interests in it cannot be bound in the lessee's reorganization.   Consequently, if the lessee's plan provides for a modified lease or merger or consolidation, such a provision is little more than an offer to the lessor.   Acceptance of this offer will be determined, not by submitting the lessee's plan to the lessor's security holders, pursuant to Section 77, but according to the law

Not the least of the difficulties with a contrary result is the fact that the Bankruptcy Act gives no clue to what proportion of the lessor's stockholders must vote to accept the offer if state law is not controlling. Section 77 (e) provides that confirmation of a plan requires acceptance by creditors holding two-thirds in amount of the total allowed claims of each class voting on the plan, but that the judge may confirm the plan in any event "if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it." But neither the two-thirds vote provision nor the so-called "cram-down" provision applies to a lessor not in reorganization or its stockholders. They apply to "creditors of each class whose claims have been filed and allowed in accordance with the requirements of subsection (c) of this section," which obviously does not include a lessor-offeree.[7] And, although South Western is a "creditor" under the specific terms of § 77 (b), its stockholders, individually, are not.

The district court sought to find a federal rule permitting acceptance by a simple majority vote of the shareholders in the provisions of § 5 (11) of the Interstate Commerce Act.[8] But that section relates to voluntary merg-

of the state where the lessor is incorporated." It is also pointed out that when the rights of bondholders of the lessor may be affected, as was the case with Terre Haute bondholders in the Milwaukee Railroad reorganization (see *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, and discussion *infra*), nearly unanimous consent of such bondholders may be required before the changes can be made effective. The Interstate Commerce Commission took that position in the *Milwaukee* case and provided that the offer to Terre Haute should not be deemed accepted unless substantially all of its bondholders voted to accept. *Chicago, M., St. P. & P. R. Co. Reorganization*, 239 I. C. C. 485, 536–538; 240 I. C. C. 257, 270–271. See also 318 U. S. at 532–533.

[7] See *In re New York, N. H. & H. R. Co.*, 54 F. Supp. 631, at 638.
[8] 54 Stat. 905, 49 U. S. C. § 5 (11).

ers, not to the purchase of a leased line as part of a plan of reorganization. The Commission can undoubtedly carry on § 5 proceedings simultaneously with § 77 reorganization proceedings, see *United States* v. *Lowden,* 308 U. S. 225 (1939), but that procedure was not followed in this case. The Commission preferred, instead, to carry out the consolidation under the authority of § 77 (b) (5) of the Bankruptcy Act, which provides that the plan of reorganization may include "the merger or consolidation of the debtor with another corporation or corporations." That power flows from a different source than the power over consolidations under the Interstate Commerce Act. While some of the findings required of the Commission under the two Acts are similar, and § 77 (f) provides that consolidation and merger of the debtor's property shall not be inconsistent with the provisions and purposes of chapter 1 of the Interstate Commerce Act, their procedural and jurisdictional requirements do not overlap.[9] It may be noted, in addition, that § 5 (11) contains a proviso that the majority vote provision shall not apply if "a different vote is required under applicable State law, in which case the number so required shall assent." Whether that proviso is operative when a state's law requires unanimous consent of the shareholders is a question we need not decide.

Nothing that we have said derogates in any way from decisions of this Court upholding the power of the Interstate Commerce Commission, in the exercise of its statutory obligations, to override state laws interposing

---

[9] See *In re Chicago, R. I. & P. R. Co.,* 168 F. 2d 587, where the State of Texas made the argument that the findings required by the Interstate Commerce Commission under subsections 2 (b), (c), and (f) of § 5 of the Interstate Commerce Act in proceedings for merger or consolidation of railroads are mandatory in proceedings under § 77 of the Bankruptcy Act.

obstacles in the path of otherwise lawful plans of reorganization. We have recently reaffirmed that power in cases arising under the Interstate Commerce Act.[10] Nor is the ambit of federal power less broad in cases arising under the bankruptcy laws of the United States. Section 77 (f) of the Bankruptcy Act specifically provides that the plan of reorganization shall be put into effect, "the laws of any State or the decision or order of any State authority to the contrary notwithstanding." The statute does not, however, give the Commission or court the right to require acceptance by a lessor not in reorganization of an offer for the purchase of its property, and no such power has been asserted by the Commission in this case. The plan of reorganization in effect hands South Western a contract of sale. Whether or not South Western signs the contract must depend not only upon its business judgment, but also upon the charter of the company and the laws of the state of its incorporation. There is therefore no occasion to override state law. The plan implicitly accepts it as controlling. The fact that the law may make acceptance of the offer less likely than would be the case if the offeree were incorporated elsewhere does not change the picture. We do not believe that Congress intended to leave to individual judges the question of whether state laws should be accepted or disregarded, *Palmer* v. *Massachusetts*, 308 U. S. 79 (1939), or to make the criterion to be applied the effect of the law upon the prospects of acceptance by the offeree.

*Second.* The district court further held that even if Georgia law governs the question of the authority of South Western's officers to sell its properties the bankruptcy court has exclusive jurisdiction to decide the state

---

[10] *Seaboard Air Line R. Co.* v. *Daniel,* 333 U. S. 118; *Schwabacher* v. *United States,* 334 U. S. 182; *Texas* v. *United States,* 292 U. S. 522.

law question. We have held that a court of bankruptcy has exclusive and nondelegable control over the administration of an estate in its possession. *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478 (1940); *Isaacs* v. *Hobbs Tie & T. Co.,* 282 U. S. 734 (1931). There can be no question, however, that Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate.[11] One exception is found in the express language of the statute.[12] What it did give is exclusive jurisdiction of the debtor and its property wherever located. § 77 (a). The interest held by the debtor in South Western's lines was a leasehold estate. Such an estate is the debtor's "property" within the meaning of the Act. Any controversy involving that estate would have been within the exclusive jurisdiction of the bankruptcy court.

Here, however, the question involves not the debtor's leasehold, but the reversion in fee held by South Western as lessor. South Western was not in reorganization jointly with its lessee, nor could it have been reorganized in the Central's proceedings.[13] The controversy which

---

[11] *Arkansas Corporation Commission* v. *Thompson,* 313 U. S. 132; *Gardner* v. *New Jersey,* 329 U. S. 565. See *Thompson* v. *Terminal Shares, Inc.,* 104 F. 2d 1. Even when the controversy involves property within the exclusive jurisdiction of the bankruptcy court, that court may, in its discretion, postpone action pending adjudication of the question in another court. *Ex parte Baldwin,* 291 U. S. 610; *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478; *Order of Railway Conductors* v. *Pitney,* 326 U. S. 561. See *Foust* v. *Munson S. S. Lines,* 299 U. S. 77. Cf. *Railroad Commission* v. *Pullman Co.,* 312 U. S. 496; *Chicago* v. *Fieldcrest Dairies,* 316 U. S. 168. Whether, if the bankruptcy court had had exclusive jurisdiction in this case, it should have withheld decision of the state law question pending the outcome of the state court action, we need not decide.

[12] § 77 (j).

[13] Under the provisions of § 77, as amended in 1935, a lessor railroad can be reorganized in connection with, or as a part of the plan of reorganization of the debtor-lessee only if a majority of its capital

respondents initiated in the state court, and which the district court decided after having enjoined the state proceedings, requires a determination of the rights of the stockholders of South Western *inter se* to sell their reversionary interest in the property. We think that the interest here involved is not part of the property of the debtor, and that the district court's assertion of exclusive jurisdiction was error.

In *Ex parte Baldwin,* 291 U. S. 610 (1934), we said (at p. 615): "All property in the possession of a bankrupt of which he claims the ownership passes, upon the filing of a petition in bankruptcy, into the custody of the court of bankruptcy. To protect its jurisdiction from interference, that court may issue an injunction." In the *Baldwin* case this Court upheld the bankruptcy court's exclusive jurisdiction under § 77 to adjudicate the question of forfeiture by the debtor of an easement of right of way—clearly a part of the property of the debtor of which it claimed ownership. See *Thompson* v. *Magnolia Petroleum Co., supra.* In *Warren* v. *Palmer,* 310 U. S. 132 (1940), where the debtor under § 77, the New Haven Railroad, was lessee of property but had rejected the lease and was operating the property for the account of the lessor under § 77 (c) (6), we held that the bankruptcy court had exclusive jurisdiction to fix the amount of the deficit resulting from such operation and to declare it a

stock is owned by the debtor. § 77 (a). When § 77 was first enacted in 1933, a lessor could also be reorganized in the lessee's proceedings if the debtor operated substantially all of the properties of the lessor, but this provision was not reenacted, even though it was proposed in the draft amendments submitted by the Federal Coordinator of Transportation, whose proposals formed the basis of the 1935 amendments. Report of the Federal Coordinator of Transportation, 1934. H. R. Doc. No. 89, 74th Cong., 1st Sess., p. 230. See Friendly, *Amendment of the Railroad Reorganization Act,* 36 Col. L. Rev. 27, 49; Meck and Masten, *Railroad Leases and Reorganization,* 49 Yale L. J. 626, 653.

lien upon the property of the lessor. Since the physical property covered by the rejected lease was within the custody of the bankruptcy court, the fact that legal title remained in the lessor was thought to be immaterial. Clearly, control of the physical property must remain in the court which has the ultimate responsibility for operating it. And in order to protect the estate of the debtor from dissipation through losses suffered in the operation of the lessor's property, responsibility for the determination of the amount of the losses and provision for their recoupment from the lessor was properly lodged in the court supervising the reorganization of the debtor.

Equally clear, however, is the fact that the internal management of the lessor is not properly subject to the court's control. The anomaly of petitioner's position is demonstrated by the facts of the case just discussed. The New Haven reorganization was proceeding in a Connecticut federal district court, while the lessor railroad, the Boston & Providence, was in reorganization under § 77 in a Massachusetts district court. The plan of reorganization of the New Haven, like the Central's plan in this case, contemplated the purchase of the lessor's property. Since the Boston & Providence reorganization court had exclusive jurisdiction of its property, it can hardly be contended that the New Haven reorganization court could assume exclusive jurisdiction to decide questions arising, for example, between different classes of creditors of the Boston & Providence as to whether the New Haven's offer should be accepted. Such a result would be incompatible with the Massachusetts district court's exclusive jurisdiction over the property of the Boston & Providence under § 77 (a).[14] Insofar as the power of the court re-

---

[14] A similar question arose in another phase of the New Haven reorganization proceedings, in connection with the use by the debtor of the Boston Terminal, which was in reorganization under § 77 in

organizing the lessee rests on its jurisdiction over the property of the debtor, the fact that the lessor here is not in reorganization in another court is immaterial.

Further support for this position is found in our decision in *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co., supra.* The Milwaukee reorganization, in one of its aspects, presented a situation analogous to the one now before us: the lessee was in reorganization under § 77, but no proceedings had been instituted for the reorganization of the lessor of some of its lines, the Chicago, Terre Haute & Southeastern Railway Company. The reorganization plan provided for a new lease to be offered the Terre Haute, which required that the latter scale down its bonded indebtedness so that the interest thereon, which was the rental under the lease, would be substantially reduced. The plan did not, however, differentiate

another court. The obligations owed by the New Haven to the Terminal Company were fixed by a Massachusetts statute, but these obligations were repudiated by the New Haven's plan of reorganization, which offered the Terminal new terms for the use of its facilities by the debtor. In considering the argument made by the Terminal's bondholders that the plan violated the New Haven's obligations under the state law, the Court of Appeals for the Second Circuit made this statement: "The plan enables New Haven to reject what in effect amounts to a burdensome lease. The plan, however, does not compel Boston Terminal to furnish the service at the rental offered; if Boston Terminal does not choose to accept the offer, it can, as a creditor, file proof of claim against New Haven for any damages to which it may be entitled. It is argued that Boston Terminal has no power under its charter to accept the offer. This seems irrelevant to the problem whether the Commission has power to approve a plan making the offer. Moreover, the reorganization trustee of Boston Terminal may be able to obtain authority to accept either from the bankruptcy court in Massachusetts or through an amendment of the Boston Terminal Act. The plan could not, and does not attempt to, amend the charter of the Terminal Company; but it does amend, as it can, the charter of the New Haven." *In re New York, N. H. & H. R. Co.,* 147 F. 2d 40, 52.

between the four classes of bonds of the lessor with respect to the earning power and character of the security of each, as is required in the reorganization of properties of the debtor. Certain bondholders accordingly attacked the plan as unfair, because it did not attempt to preserve the respective priorities of these bond issues. But we said (p. 546): "The short answer to that objection is that the Terre Haute properties have not been treated by the Commission or the District Court as a part of the properties of the debtor for reorganization purposes. Nor has any question been raised or argued here as to the power of the Commission or the District Court so to treat them. The Commission and the District Court considered the problem solely as one of rejection or affirmance of a lease." It is abundantly clear that in the case before us, the interest of South Western was similarly considered.[15]

Other provisions of § 77 lend no support to petitioner's contentions. Section 77 (b), which makes South Western a creditor in the proceedings, does not, as we have pointed out, give the bankruptcy court any control over its internal organization. It is not a creditor which can

---

[15] It may also be noted that the Terre Haute could have been reorganized in the Milwaukee proceedings if insolvent or unable to meet its debts, since the Milwaukee owned substantially all of the Terre Haute's stock. See note 13, *supra*. The lessor's bondholders were therefore more like holders of the debtor's bonds than are stockholders of an independently owned lessor. This argument was made before the Commission by an institutional investors group committee, which contended that the assets of Terre Haute should be treated as assets of the debtor for purposes of reorganization. The Commission rejected the argument, saying: "We agree with the group of Terre Haute bondholders that they are not such creditors of the debtor as would be bound as a class by a confirmed plan of reorganization which divested them of their existing liens upon the Terre Haute properties." 239 I. C. C. 485, 535. See Swaine, *A Decade of Railroad Reorganization Under Section 77 of the Federal Bankruptcy Act,* 56 Harv. L. Rev. 1193, 1217.

be bound by the plan without its assent, except to the extent of its claim for damages for breach of the lease and for amounts due it from the lessee.[16]   Section 77 (b) (1) provides that the plan may alter the rights of creditors, while § 77 (b) (5) requires that the plan provide adequate means for its execution, which may include merger or consolidation of the debtor with another corporation. This subsection also permits rejection of executory contracts and unexpired leases.

The bankruptcy power unquestionably gives the Commission and court, working within the framework of the Act, full and complete power not only over the debtor and its property, but also, as a corollary, over any rights that may be asserted against it.   These rights may be altered in any way thought necessary to achieve sound financial and operating conditions for the reorganized company, subject to the requirements of the Act.   The purchase of formerly leased properties does not involve rights asserted against the debtor, however.[17]   This Court has said that "The exclusive jurisdiction granted

---

[16] The dual status of a lessor whose lease has been, or will be, rejected and to whom an offer of purchase or modification is made is explained by Meck, *The Problems of the Leased Line,* 7 Law and Contemp. Prob. 509, 516, as follows: "The plan in theory must deal with the lessor in at least two capacities: as an unsecured creditor and as owner of the leased line.   In the former capacity the lessor will receive the same treatment as other unsecured creditors.   In the latter, however, the lessor will be treated in accordance with the value of the line to the lessee."   See note 6, *supra.*

[17] The offer of purchase may, as was true in this case, include a provision requiring the lessor-offeree to renounce the claims it could otherwise assert against the debtor, including claims for breach of the lease and for amounts due the lessor under the lease or other agreements between the parties.   261 I. C. C. 515.   These factors are taken into consideration in determining the amount to be offered under the plan.   See 261 I. C. C. at 272 and 295.

the reorganization court by § 77 (a) is that which bankruptcy courts have customarily possessed." *Meyer* v. *Fleming*, 327 U. S. 161, 164 (1946).[18] We conceive the jurisdiction asserted by the district court over a solvent lessor not in reorganization to be an extension of these traditional powers not justified by any provisions of the Bankruptcy Act.

A serious practical problem would arise if the consequence of rejection of the offer and return of the properties to South Western would be cessation of railroad service on the formerly leased lines. Congress has foreseen that difficulty, however. Under § 77 (c) (6), if the lessor is unable to operate the leased lines following rejection of the lease, the duty devolves upon the lessee to continue to operate the leased lines for the account of the lessor,[19] and such operation may continue after completion of the reorganization of the lessee.[20] We need not speculate upon the eventual disposition of South Western's properties. Until some final disposition is made, however, we

---

[18] Cf. *In re Adolf Gobel, Inc.*, 80 F. 2d 849, involving § 77B proceedings, and *Greenbaum* v. *Lehrenkrauss Corp.*, 73 F. 2d 285, an equity receivership.

[19] Section 77 (c) (6) provides: "If a lease of a line of railroad is rejected, and if the lessee, with the approval of the judge, shall elect no longer to operate the leased line, it shall be the duty of the lessor at the end of a period to be fixed by the judge to begin the operation of such line, unless the judge, upon the petition of the lessor, shall decree after hearing that it would be impracticable and contrary to the public interest for the lessor to operate the said line, in which event it shall be the duty of the lessee to continue operation on or for the account of the lessor until the abandonment of such line is authorized by the Commission in accordance with the provisions of section 1 of Title 49, as amended."

[20] Operation of the Boston & Providence Railroad for its account is now being carried on by the reorganized New Haven pending completion of reorganization of the Boston & Providence. See *In re New York, N. H. & H. R. Co.*, 169 F. 2d 337.

are assured that service will be maintained on its lines, and that the debtor will not be prejudiced because of the duty thrust upon it. *Palmer* v. *Webster & Atlas National Bank,* 312 U. S. 156 (1941).

*Third.* It is argued that *Continental Illinois National Bank* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648 (1935), and other cases applying similar principles support the district court's injunction of the state action and its determination of the issue there involved. The question specifically before the Court in the *Rock Island* case was this: "Under § 77 does the bankruptcy court have authority to enjoin the sale of the collateral here in question if a sale would so hinder, obstruct and delay the preparation and consummation of a plan of reorganization as probably to defeat it?" The affirmative answer given by the Court rested upon the inherent powers of a court of equity to prevent the defeat or impairment of its jurisdiction, upon § 262 of the old Judicial Code, which authorized United States courts "to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions," and upon § 2 (15) of the Bankruptcy Act, 11 U. S. C. § 11 (15), which gives bankruptcy courts the power to "Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act." 52 Stat. 843.

Reliance upon these cases is based, however, upon the fallacy previously adverted to. The action in the Georgia courts in this case does not embarrass or delay the formulation or promulgation of a plan of reorganization. The plan has been formulated and approved. It leaves open to South Western the alternative of selling its properties to the reorganized debtor or of facing disaffirmance of the lease and the risks of separate operation of its lines. No

150

suggestion has been made that a final decision of the state law question will be unreasonably delayed. Under these circumstances, we do not believe that the *Rock Island* decision provides any support for the district court's action.[21]  As we held in *Thompson* v. *Texas Mexican R. Co.*, 328 U. S. 134 (1946) at 142: "Forfeiture of leases by the court in advance of a determination by the Commission of the nature of the plan of reorganization which is necessary or desirable for the debtor may seriously interfere with the performance by the Commission of the functions entrusted to it."  See also *Smith* v. *Hoboken R. Co.*, 328 U. S. 123 (1946).  The same considerations do not prevail at a later stage of the proceedings, however, when, pursuant to a plan formulated by the Commission, the lease is forfeited and an offer of purchase substituted in lieu thereof.  Unless the offer is a sham and the lessor's discretion illusory, the plan may be effectively consummated whether the offeree accepts or not.  The district court did not merely postpone action which would have hindered the development of the plan; it took to itself the decision of a question which the plan left open for decision elsewhere.

We conclude that, under the narrow facts presented here, the bankruptcy court erred in enjoining the state court suit leading to a determination of the requirements of Georgia law with respect to sale of the entire assets of South Western.  This question was already in litigation in the state court when first raised in the federal court. Title 28 U. S. C. § 2283 forbids this exercise of power, since, as we hold, the controversy does not involve property of the debtor within the jurisdiction of the bank-

[21] Cf. *In re New York, N. H. & H. R. Co.*, 102 F. 2d 923; *Guaranty Trust Co.* v. *Henwood*, 86 F. 2d 347; *Central Hanover Bank* v. *Callaway*, 135 F. 2d 592.

ruptcy court, and the assertion of jurisdiction by the state court is not inconsistent with the provisions of the Bankruptcy Act.[22]

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE RUTLEDGE concurs, dissenting.

This decision permits control over the plan of reorganization to be taken from the Interstate Commerce Commission and the District Court contrary to the provisions of § 77 and allows a state court to undo what those federal agencies have approved.

The plan approved by the Commission and by the District Court provides for the "consolidation, merger or purchase" of the properties of South Western in lieu of continued operation under the lease, "if the leased properties can be acquired on the terms set forth in the Plan."

The terms of the acquisition are set forth in the plan. If the leased lines are acquired, South Western shall waive any damages on account of breach of the lease and in respect of equipment. Securities allocated to South Western shall not bear interest or dividends for any period prior to the acquisition. The plan also determines the amount of the allotment to South Western which the Commission and the court approved as "fair and equitable" and "equal the value of the transportation property."

On February 11, 1947, the Commission submitted the plan to all creditors, including South Western, for acceptance or rejection on or before midnight March 28, 1947. On March 13, 1947, the directors of South Western accepted the plan subject to the assent of the holders of

---

[22] *Kline* v. *Burke Construction Co.,* 260 U. S. 226; *Ex parte Baldwin,* 291 U. S. 610; *Mandeville* v. *Canterbury,* 318 U. S. 47.

a majority of its stock. The stockholders met on March 28, 1947, and accepted the plan by a vote of 30,137 to 9,057. Accordingly South Western mailed its ballot approving the plan to the Commission.

The result of the balloting was certified by the Commission to the court. Thereafter the court had a hearing and confirmed the plan, specifically reserving for later adjudication the question whether it had power to enjoin action in a state court which attempted to annul the acceptance of the plan by South Western. Subsequently it held a hearing, overruled objections of the minority of South Western's stockholders and held that the acceptance by South Western was valid under Georgia law. It accordingly issued the injunction involved in this case.

It seems plain to me that the Commission and the reorganization court had exclusive jurisdiction, subject to judicial review, to determine the question of the validity of the acceptance of the plan tendered by the officers of South Western. The validity of the acceptance is, of course, a question of state law. But it has been entrusted by Congress to these federal agencies.

The plan must first be approved by the Commission and then certified to the court. § 77 (d) (e). The court, after hearing, passes on the plan; and if the court approves the plan, it certifies that fact to the Commission. § 77 (e). The Commission then submits the plan to creditors and stockholders (§ 77 (e)), the lessor and its security holders being included in the definition of creditor. § 77 (b). See *Group of Investors* v. *Milwaukee R. Co.*, 318 U. S. 523, 549. The Commission must then determine the result of the balloting and certify to the judge "the results of such submission." § 77 (e). The court then "shall confirm" the plan if satisfied (1) that the requisite percentage of each class of creditors and stockholders has been obtained and (2) "that *such acceptances have not been made or procured by any means*

*forbidden by law."* § 77 (e). (Italics added.) On confirmation of the plan by the court, the plan and order of confirmation "shall, subject to the right of judicial review," be binding upon the debtor and stockholders and "all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed, whether or not approved, including creditors who have not, as well as those who have, accepted it." § 77 (f).

Section 77 (f) also provides that on confirmation of the plan the debtor or any other corporation organized to carry out the plan "shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, under and subject to the supervision and the control of the judge, *the laws of any State or the decision or order of any State authority to the contrary notwithstanding."* (Italics added.) And § 77 (j), with exceptions not material here, gives the court power to enjoin or stay the commencement of any suit against the debtor until after final decree.[1]

The control of the court over the acceptance of the plan and over its confirmation is one of the historic instances of the "exclusive jurisdiction" vested in the court by § 77 (a). The exclusive jurisdiction of the reorganization court is one which heretofore we have zealously guarded against encroachments by state courts. See *Thompson* v. *Texas Mexican R. Co.*, 328 U. S. 134. That exclusive jurisdiction is not restricted to protection of the court's possession of the property and operation of the business. Section 77 (e) gives the reorganization court the sole authority to determine whether the accept-

---

[1] This subsection provides in part: "In addition to the provisions of section 29 of this title for the staying of pending suits against the debtor, the judge may enjoin or stay the commencement or continuation of suits against the debtor until after final decree . . . ."

ances of the plan have been made or procured "by any means forbidden by law." In this case that plainly means that the reorganization court alone had the power to ascertain whether the requisite vote of the directors and stockholders of South Western had been cast in favor of the plan. Once it determined that lawful corporate action had been taken by South Western, then § 77 (f) bound all of South Western's stockholders, since they are included in the definition of creditors for the purposes of the Act. See *Group of Investors* v. *Milwaukee R. Co., supra.* And then the reorganization court had the express power under § 77 (f) to put the plan into effect—"the laws of any State or the decision or order of any State authority to the contrary notwithstanding."

This is precisely one of those situations where the bankruptcy court, if its exclusive jurisdiction is to be maintained, must have the power to enjoin action in state courts. It has long been recognized to have that authority in order to protect its decree. See *Local Loan Co.* v. *Hunt,* 292 U. S. 234. And the policy reflected in old § 265 of the Judicial Code—now 28 U. S. C. § 2283—which frowned on the stay of state proceedings by federal courts, has for years recognized bankruptcy jurisdiction as an exception. See *Toucey* v. *N. Y. Life Ins. Co.,* 314 U. S. 118, 132. It was in recognition of the necessity for that power that Congress wrote subdivision (j) into § 77.

If a state court can hold invalid acceptances whose validity has been approved by the Commission and the District Court, then the federal agencies have lost much of the exclusive jurisdiction which Congress granted them. There are myriad questions of state law underlying the consummation of every plan of reorganization. There is the question whether the new company is validly organized; whether proxies are executed in pursuance of the provisions of the state code; whether the charter of a

corporation can contain certain kinds of provisions, authorize certain types of securities, etc., etc. If state courts can intrude with injunctions on such state law questions, the exclusive command of the federal agencies over the reorganization process is lost, its efficiency is undermined, and minorities are given leverages which the scheme of § 77 explicitly denies.