**John M. JORDAN, Appellant,**

v.

**RANDOLPH MILLS, INC.,**
**Appellee/Debtor.**

**Nos. C–82–903–G, B–79–01136.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

March 30, 1983.

Jeffrey A. Andrews of Vernon, Vernon, Wooten, Brown & Andrews, Burlington, N.C., for appellant.

Arlene Pianko Groner, Sol., F.E.R.C., Washington, D.C., for intervenor.

R. Bradford Leggett of Allman, Spry, Humphreys & Armentrout, Winston-Salem, N.C., and Wesley B. Grant of Grant & Hastings, Concord, N.C., for appellee.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, Chief Judge.

This matter comes before the Court upon the appeal of John M. Jordan from the Order (June 28, 1982) (hereafter Contempt Order) of the Bankruptcy Court finding

him in contempt of its Restraining Order entered July 13, 1979. The Restraining Order enjoined all persons from "in any way interfering with or disturbing the property and assets of [the] debtor [Randolph Mills, Inc.], until further order of . . ." the court. In the Contempt Order the court found that Jordan's actions in obtaining a permit and applying for a license to generate hydroelectric power at dams owned by the debtor have "affected the property rights of the Debtor and have impaired the Debtor's ability to sell one of its valuable assets." Furthermore, the court concluded that Jordan was in civil contempt; that all permits, licenses, and applications insofar as they affect the dams are null and void; that Jordan and his corporation, Sellers Manufacturing Co., must take steps to assure that the records of the Federal Energy Regulatory Commission (FERC) reflect the null and void status of the documents; that monetary sanctions could be imposed if Jordan fails to comply; and that once the court no longer has jurisdiction over the dams (*i.e.*, they are sold) Jordan could reapply *de novo*, but would not be entitled to any benefit from his prior actions in the *de novo* application proceedings.

Jordan appealed this ruling on July 19, 1982, and raised issues as to the court's jurisdiction, its power to declare the documents null and void, and whether his pursuit of a license violated the Restraining Order. (He filed the appeal in this Court on August 24, 1982). The Bankruptcy Court, upon motion, stayed the imposition of its Contempt Order. Order Granting Stay (August 2, 1982). On August 25, 1983, FERC filed a Motion for Leave to Intervene in order to challenge the court's ruling that the documents were null and void.[1] The Court permitted intervention. Order (August 27, 1982).

Having reviewed the parties' contentions, the Court reached the following conclusions. The Bankruptcy Court had authority to enjoin the act of applying for permits and licenses. Jordan violated the July 13, 1979, Restraining Order by applying for and obtaining preliminary permits and by applying for licenses to operate hydroelectric projects at dams owned by Randolph Mills, Inc., a Chapter XI debtor-in-possession.

BACKGROUND

The parties appear to be in agreement on the following facts. The debtor, Randolph Mills, Inc., owns *two dams* across the Deep River near Asheboro. Located at the dams is hydroelectric generating equipment which is in poor condition because of lack of use. The debtor also owns surrounding land. The Deep River is a navigable river. On July 13, 1979, the debtor filed a Chapter XI petition, 11 U.S.C. §§ 701–799.[2]

Several months after this filing Jordan applied with FERC for two preliminary permits in order to study the economic feasibility of developing hydroelectric power at the debtor's dams. 16 U.S.C. § 797(f); 18 C.F.R. §§ 4.80–.83 (April 1, 1980). His permit applications dealt strictly with those dams. Subsequently, on June 19 and 24, 1980, FERC caused to be issued public notices about the applications for permits and explanations of how to protest the pending applications or intervene. 16 U.S.C. § 797(f); *see* 18 C.F.R. §§ 1.8–.10. On July 10, 1980, a legal notice to this effect appeared in The Courier-Tribune, an Asheboro newspaper. Upon seeing the notice the debtor by letter informed Jordan and FERC of the Restraining Order and gave them its opinion that Jordan's actions were in contravention thereof. Attorneys of FERC unofficially informed Jordan that his actions were proper and outside the realm of the bankruptcy proceedings. Jordan persisted in his effort.

---

1. FERC advised that Jordan's arguments on appeal missed the point. Jordan, at that time, contended essentially that the court lacked power to rule as it did because the debtor had no compensable property interest in the river's water power and that, consequently, the granting of a permit or license could in no way lessen the debtor's property rights. FERC argued that its exclusive authority in the area of hydroelectric development takes precedence over bankruptcy matters.

2. The Bankruptcy Act of 1898 applies in this case.

On August 22, 1980, Walter M. Clark, debtor's president, requested from FERC an extension of time in which to file competing permit applications. FERC consented since it was a timely request. However, believing that it would be a violation of the Restraining Order, Clark notified FERC on October 22, 1980, that he would file no applications.

On November 18, 1980, FERC issued the permits to Jordan and noted that no one who commented on the applications had objected to their issuance. Receipt of the permits secured for Jordan certain rights.

> The sole purpose of a preliminary permit is to secure priority of application for a license for a water power project under Part I of the Federal Power Act [16 U.S.C. § 791a–823] while the permittee obtains the data and performs the acts required to determine the feasibility of the project and to support an application for a license.

18 C.F.R. § 4.80. These permits had a term of one year. During the following year Jordan hired engineers and consultants to study the dam's hydroelectric potential at a cost of around $25,000. On October 26, 1981, Jordan, in compliance with FERC regulations, filed two license applications. 16 U.S.C. § 797(e); 18 C.F.R. § 4.51. If granted, the licenses would permit Jordan to generate hydroelectricity and provide him with the power to condemn the dams if the owner refused to sell after negotiations. 16 U.S.C. § 814.

On February 4, 1982, the court, upon the debtor's motion, authorized the debtor to sell *one* of the dams and land, the Upper Dam Tract, to William H. Lee for $170,000. 11 U.S.C. § 713(2); Bankruptcy Rule 11–54(b). One of the specific conditions of sale "was that there be no permits or licenses or applications therefor, either issued by or pending before [FERC]." Contempt Order ¶ 7.

On March 3, 1982, FERC issued public notices of the license applications. Two days later the debtor requested Jordan, by letter, to cease and desist from obtaining the licenses. Jordan responded on March 19, 1982, stated that he would continue, and commented that he would negotiate with Lee if Lee bought the one dam.

On March 24, 1982, the debtor filed an Application for Order Directing John M. Jordan to Show Cause wherein it contended that Jordan's actions were in violation of the Restraining Order. The court issued the Order to Show Cause on May 10, 1982. The court issued its Contempt Order on June 28, 1982. On July 19, 1982, *Lee* requested permission from FERC to file a competing license application out of time, which FERC denied in accordance with its policy of strict enforcement of filing deadlines.

In the Contempt Order the Bankruptcy Court outlined most of these facts just reviewed and specifically found that Jordan's actions had jeopardized the debtor's ability to sell the property in question. It found that "[t]he sale of the Upper Dam Tract ... is crucial to the continued existence of this Debtor and its prospects for rehabilitation." Order ¶ 11. Furthermore, the court found that Jordan acted with knowledge of the Chapter XI proceeding and the Restraining Order. Jordan never requested of the court relief from the Restraining Order.

## DISCUSSION

FERC argues that the jurisdiction of the Bankruptcy Court is narrow in that it only extends to the debtor and his property. Although the court's jurisdiction within these boundaries is exclusive, it lacks power to invade the exclusive authority of FERC over hydroelectric power development by declaring applications it has accepted or permits and licenses it has issued to be null and void or otherwise interfere with FERC's evaluation of a licensed applicant's (Jordan's) qualifications. FERC comments that allowing the court such power would injure the public interest and run contrary to the intent of Congress that FERC have exclusive control over such matters.

In any event, FERC contends, no action by it has interfered with the debtor's legitimate interests because (1) the debtor's property rights remain the same and (2) if

the dams are condemned, 16 U.S.C. § 814, the debtor will sustain no loss since it will receive fair market value. FERC makes the argument that the Bankruptcy Court could not approve the no-license/no-application condition since issuance of such documents is under FERC's exclusive control. It makes the final argument that the debtor has no right to collaterally challenge FERC's actions or Jordan's application since it filed no timely protest or competing application with the agency. Since the debtor chose not to so act, it loses the right of judicial review. 16 U.S.C. § 825*l* (person seeking review must have exhausted administrative remedies). This final argument presupposes absence of jurisdiction in the Bankruptcy Court.

Jordan contends that the resolution of this case turns on the relationship between riparian landowners and the federal government. When the government issues a license it does not interfere with the riparian property rights, but only delegates to the licensee property rights already held by the government under the Commerce Clause in the flow of the navigable river. Also, if Jordan receives a license, then any exercise of the eminent domain power attaching thereto could not diminish the debtor's property because the debtor must be paid fair market value. Jordan also echoes the other arguments of FERC.

The debtor contends that the Bankruptcy Court had broad injunctive powers and that Jordan erred by not requesting relief from the Restraining Order. The interference according to the debtor is the eminent domain power a license carries. The debtor also asserts that if licensed, Jordan could only exercise his eminent domain power upon permission by the Bankruptcy Court.

The Bankruptcy Court had authority to issue the July 13, 1979, Restraining Order enjoining "all persons" from "in any way interfering with or disturbing the property and assets of" the debtor. 11 U.S.C. §§ 11a(15) & 715; Bankruptcy Rule 11–44.

Section 711 of Title 11 gives the court exclusive jurisdiction over the debtor and its property wherever located. Section 11a(15) provides that the court may "make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act . . . ." [3] The court has the authority to stay lawsuits against the debtor as well as, for cause shown, stay proceedings to enforce liens against the debtor's property. 11 U.S.C. § 714. Furthermore, Bankruptcy Rule 11–44 makes the exercise of that authority under section 714 automatic upon the filing of a Chapter XI petition. Finally, the Bankruptcy Court also possesses injunctive powers under the All Writs Act, 28 U.S.C. § 1651, and its general equity powers. *SEC v. United States Realty and Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293, 1303–04 (1940); *Continental Illinois National Bank and Trust Co. v. Chicago, Rock Island and Pacific Railway Co.,* 294 U.S. 648, 675–76, 55 S.Ct. 595, 605–606, 79 L.Ed. 1110, 1128 (1935). One commentator succinctly states that "[i]njunctions may be issued, when necessary, to prevent the defeat or impairment of the jurisdiction of the bankruptcy court, to enforce the provisions of the Act, and to effect the object of the case [Chapter XI] free from interference." 8 *Collier on Bankruptcy* ¶ 3.23[1] at 264 (1978).

The need for broad injunctive power is particularly present in a Chapter XI proceeding. This Chapter is distinct from other types of bankruptcy proceedings. Congress created Chapter XI to enable a debtor to obtain an arrangement (*i.e.,* a composition or extension) with unsecured creditors while under the Bankruptcy Court's protection so that the debtor can not only continue his business during the proceeding, but also save his business. D. Cowans, *Bankruptcy Law and Practice* § 84 at 72–73 (1963). The debtor remains in possession of his property. Thus, the debtor does not

---

**3.** The provisions of Chapters I–VII apply to proceedings under Chapter XI except where

inconsistent. 11 U.S.C. § 702.

seek an adjudication in bankruptcy or a liquidation and distribution of his property. Unsecured creditors must believe that the debtor will be able to meet current expenses and keep operating before théy will likely agree to any arrangement. Interference with the debtor's assets and property is clearly detrimental to the prospects of a struggling business' ability to meet current expenses and its obligations under an arrangement. The Bankruptcy Court's need for injunctive power and exclusive jurisdiction over the property is important to the success of a Chapter XI proceeding. *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir.1979); *In re Fabric Tree*, 426 F.Supp. 872, 877 (S.D.N.Y.), *aff'd*, 558 F.2d 1069 (2d Cir.1977). Here, the debtor seeks to sell the property to raise funds to meet expenses.

One purpose of the bankruptcy laws is expedited administration and settlement of bankruptcy estates. Interference with the debtor's property is antagonistic to this purpose to the extent it prolongs the bankruptcy proceedings. The court's jurisdiction or authority to deal with such interference should be measured against this purpose of the bankruptcy laws. *Katchan v. Landy*, 382 U.S. 323, 328, 86 S.Ct. 467, 471–472, 15 L.Ed.2d 391, 396 (1966); *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160.

The Bankruptcy Court found that Jordan's actions "have affected the property rights of the Debtor and have impaired the Debtor's ability to sell one of its valuable assets." Order ¶ 11. It also found that the sale of the Upper Dam Tract to Lee was "crucial to the continued existence of this Debtor and its prospects for rehabilitation." Order ¶ 11. Findings of the Bankruptcy Court must be accepted unless clearly erroneous. Bankruptcy Rule 810.

■ In a technical sense it appears to be true that Jordan's actions did not deprive the debtor of any of its property rights because of the federal government's superior navigation easement to the river under the Commerce Clause. *United States v. Twin River Power Co.*, 350 U.S. 222, 224–25, 76 S.Ct. 259, 260–261, 100 L.Ed. 240, 245 (1956). The government's exercise of its control over navigable waters is not an invasion of private property rights. *United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941). The licensing of hydroelectric dams by FERC is an exercise of the government's plenary power over navigable waters. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Once licensed, Jordan would be able to condemn property of the debtor in order to put into operation the FERC-approved hydroelectric dam. 16 U.S.C. § 814. This eminent domain power extends to whatever water rights the debtor might have since the Federal Power Act "treats usufructuary water rights like other property rights." *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 251, 74 S.Ct. 487, 494, 98 L.Ed. 666, 677 (1954).[4] The debtor did not have the right to refuse or defeat the exercise of the government's eminent domain power against its dams.

■ On the other hand, Jordan's actions have interfered with the debtor's property, the dams and the Upper Dam Tract. Simply stated, his efforts to acquire licenses from FERC have curtailed the marketability of the dams and the Upper Dam Tract and interfered with efforts to obtain a successful arrangement. This fact is obvious so far as the approved sale to Lee is concerned—Lee's offer is made on condition that there be no applications and permits.[5]

4. For a discussion of North Carolina law on riparian rights, *see* 13 *Strong's North Carolina Index* 3d Waters and Watercourses § 6.1 (1978).

5. At first glance it is troubling that the order approving the conditional sale to Lee came more than one year after Jordan applied for

preliminary permits. However, these applications were made several months after the debtor filed its Chapter XI petition and the Bankruptcy Court entered the Restraining Order at issue. The debtor informed Jordan of the Restraining Order soon after seeing a published notice of Jordan's permit applications. Jordan had not invested in feasibility studies at that

However, more fundamental is the fact that this interference or curtailing of the property's marketability was clearly foreseeable when Jordan first applied for preliminary permits. People usually do not tie-up significant sums of money in land knowing someone else will likely shortly take it from them through condemnation. Finally, his efforts before FERC have interfered with the court's control over the debtor's affairs.

Section 713(2) of Title 11 and Bankruptcy Rule 11–54(b) empower the Bankruptcy Court in a Chapter XI proceeding to authorize the debtor-in-possession to sell real property of the debtor upon cause shown and upon such terms and conditions as the court may approve. Generally, sales arise under these provisions where they would be to the estate's advantage in securing an arrangement with unsecured creditors. In its order authorizing the sale to Lee, the Bankruptcy Court stated that the sale was in the best interest of the estate's administration. Jordan does not contest the validity of that order. Under the circumstances the Bankruptcy Court's findings concerning impairment of marketability, the need for the sale, and, specifically, the sale to Lee are not clearly erroneous.

While Jordan's actions appear to be violations of the Restraining Order of July 13, 1979, the question remains whether the Bankruptcy Court had the authority to restrain the application for and receipt of preliminary permits and licenses from FERC.

Congress entrusted to FERC comprehensive control over uses of water resources including hydroelectric development. A major responsibility of FERC is determining whether private construction is consistent with public policy and public interest. 16 U.S.C. § 803(a). FERC controls develop-

ment through its licensing power. *New England Power Co. v. New Hampshire,* 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982); *Federal Power Commission v. Union Electric Co.,* 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965).[6]

Jordan and FERC base their argument that the Bankruptcy Court lacked authority to restrain Jordan's efforts upon FERC's exclusive control over licensing. In light of FERC's comprehensive control over the licensing of hydroelectric dams, a bankruptcy court would surely venture outside its authority or jurisdiction (as well as its expertise) if it sought to impose on FERC its own criteria on licensing or planning. The Bankruptcy Court never remotely committed such an action. However, the court did declare all permits, licenses, and applications for permits and licenses to be null and void.[7] Also, after stating that Jordan could resubmit license applications after the sale, the court specified that Jordan "shall be entitled to no benefit or enhancement of his position [with FERC] by virtue of his previous" applications and permits. Order at ¶ 19. The Bankruptcy Court also ordered Jordan to take appropriate steps to assure that FERC records will show his applications and expired preliminary permits as null and void. These directives by the Bankruptcy Court were proper, except to the extent, if any, that they might curtail how FERC in its judgment will receive and process any new license applications consistent with the statutory law and its regulations.[8]

The Court seeks to read the law governing the Bankruptcy Court's injunctive powers and FERC's licensing power in a manner which will avoid conflicts. *Durand v. NLRB,* 296 F.Supp. 1049, 1055 (W.D.Ark. 1969). To this end it is important to note what Jordan's efforts do not involve. Spe-

---

time. Nonetheless, apparently relying upon FERC's *unofficial* opinion, Jordan chose not to seek relief from the Restraining Order. Order ¶ 12. Fault obviously lies with Jordan.

**6.** Congress transferred the duties of the Federal Power Commission to FERC, an organization within the Department of Energy.

**7.** Declaring all licenses null and void was unnecessary since there were no outstanding or pre-existing licenses.

**8.** For example, FERC could conceivably give any new application expedited attention.

cifically, Jordan's efforts were not directed at remedying any illegal conduct by the debtor or any illegal condition at the dams. Proceedings to enforce health, welfare, morals, or safety apply to businesses which are in bankruptcy. *Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 775–76 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982); *In re Dolly Madison Industries, Inc.*, 504 F.2d 499 (3d Cir.1974); *Cullen v. Bowles*, 148 F.2d 621, 623 (2d Cir.1945); *see also Nathanson v. NLRB*, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952) (court should stay its hand and await an administrative decision regarding matters entrusted by Congress to the agency); 11 U.S.C. § 362(b)(4) (automatic stay provision under the new Bankruptcy Code does not apply to governmental proceedings to enforce police or regulatory powers). In *In re Canarico Quarries, Inc.*, 466 F.Supp. 1333 (D.P.R.1979) the district court held that the bankruptcy court lacked authority under Bankruptcy Rule 11–44 to order the continued operation of a Chapter XI debtor's business in violation of state laws for attainment of goals set forth in the Federal Clean Air Act, 42 U.S.C. §§ 7401–7642. The district court in *In re Colonial Taverns, Inc.*, 420 F.Supp. 44 (D.Mass.1976) held that the bankruptcy court could not under Bankruptcy Rule 11–44 enjoin enforcement of a state's comprehensive regulation of liquor licensing where the licensing board sought to suspend the Chapter XI debtor's license because of a curfew violation. Often debtors-in-possession or trustees have objected to unfair labor practices proceedings before the NLRB on the grounds that a stay under 11 U.S.C. § 714 or an automatic stay of Bankruptcy Rule 11–44 barred them. While circuit courts have recognized the Bankruptcy Court's discretionary power to stay such a proceeding if it finds the proceeding to severely threaten the estate's assets, they commonly reject the debtor-in-possession or trustee's objection because of the important labor policies vindicated by such NLRB proceeding. *In re Shippers Interstate Services, Inc.*, 618 F.2d 9 (7th Cir.1980); *In re Bel Air Chateau Hospital, Inc.*, 611 F.2d 1248 (9th Cir.1979).

■ If Jordan had acquired licenses prior to the filing of the Chapter XI petition, but subsequently sought to condemn the dams, then the case would obviously be different. The court would not be able to enjoin the condemnation. Bankruptcy Court orders enjoining interference with the debtor's property are effective to enjoin condemnation proceedings brought by a state or local government authority. *In re New York, New Haven, and Hartford Railroad Co.*, 447 F.2d 428 (2d Cir.1971); *but see Massachusetts v. Bartlett*, 384 F.2d 819 (1st Cir.1967), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968) (state's interest must prevail over debtor's). The court in *Hartford Railroad Co.* predicted a contrary result if the condemnation action was brought by the federal government. *Accord, United States v. New York, New Haven, and Hartford Railroad Co.*, 348 F.2d 151 (1st Cir. 1965); *but see United States v. Certain Land in the City of Murlboro*, 234 F.Supp. 426 (D.Mass.1964) (federal government must seek prior approval of reorganization court as a jurisdictional or procedural prerequisite to a condemnation proceeding since property was in that court's exclusive jurisdiction). A similar rule should apply to licensees of the federal government under the Federal Power Act. *See Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119–120, 80 S.Ct. 543, 555–556, 4 L.Ed.2d 584, 598 (1960) (treaty or convention requirement for valid transfer of Indian lands does not apply to condemnation actions brought by licensee under Federal Power Act).

■ Appellant directs the Court's attention to cases involving efforts by a third party to acquire property of another person which indirectly affect the debtor's property, the effect being diminishing the value of the debtor's property. In those cases courts have held that the bankruptcy court could not enjoin the third party's efforts, which were usually lawsuits. These decisions are based on the fact that the bankruptcy court's summary jurisdiction extends to adjudicating questions regarding property in its actual or constructive possession by vir-

tue of its exclusive jurisdiction over the debtor and his property. Thus, the court's jurisdiction does not extend to control property in which the debtor has no property interest. *Riffe Petroleum Co. v. Cibro Sales Corp.,* 601 F.2d 1385 (10th Cir.1979); *Jaytee-Penndel Co. v. Bloor,* 547 F.2d 13 (2d Cir.1976); *In re Beck Industries, Inc.,* 479 F.2d 410 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *In re New York and Worcester Express, Inc.,* 294 F.Supp. 1163 (S.D.N.Y.1968); *In re Panitz & Co.,* 270 F.Supp. 448 (D.Md.), *aff'd sub nom. Hammerman v. Arlington Federal Savings and Loan Association,* 385 F.2d 835 (4th Cir.1967). In order to enjoin such actions by a third party, the court must identify some direct effect on the debtor's property or some unacceptable embarrassment or delay to the bankruptcy proceeding resulting from the actions. The mere fact that the third party's efforts merely have made financing more difficult for the debtor or reduced the estate's value has been viewed as too indirect a consequence of those efforts. *Jaytee-Penndel Co. v. Bloor,* 547 F.2d at 16; *In re New York and Worcester Express, Inc.,* 294 F.Supp. 1163.

In *Callaway v. Benton,* 346 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), the Supreme Court addressed the bankruptcy court's jurisdiction over a lawsuit brought by a third party concerning property in which the debtor held a leasehold interest. Because the third party's action did not involve the leasehold, rather the reversion in fee held by the lessor, the Supreme Court concluded that the bankruptcy court did not have jurisdiction. It stated that "Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate." *Calloway v. Benton,* 336 U.S. at 142, 69 S.Ct. at 441–442, 93 L.Ed. at 561. However, the Supreme Court also noted that the third party action did not delay the implementation of the reorganization plan because it had previously been formulated and approved. It also specifically noted that the bankruptcy court had "power not only over the debtor and its property, but also, as a corollary, over any rights that may be as-

serted against it." *Callaway v. Benton,* 336 U.S. at 147, 69 S.Ct. at 444, 93 L.Ed. at 564.

■ The debtor here has no property interest in the license, since it arises out of the government's powers under the Commerce Clause over navigable rivers. Thus, the appellant Jordan argues that the court lacked jurisdiction to intercede in the licensing process. Although this analysis is not without some appeal, it loses sight of the total picture. The license would give Jordan power or rights that he may assert against the dams—the power of eminent domain. Moreover, the licensing proceeding has interfered with the Chapter XI proceeding, specifically the approved sale to Lee. Therefore, Jordan's actions have not had a mere indirect effect on the debtor's property. Inasmuch as the eminent domain power accompanies receipt of a license, the Bankruptcy Court was not obliged to remain idle, endure the consequent disruption of the Chapter XI proceeding and interference with its jurisdiction, and await FERC's final judgment on whether to grant the license.

Finally, this case does not involve a proceeding brought under the government's war powers during a national emergency. In such a situation laws enacted for the protection of the nation may take precedence over the bankruptcy laws. *United States v. 1.94 Acres of Land,* 51 F.Supp. 162 (M.D.Pa.1943).

This case does involve an attempt by a third party to acquire a power or right against the dams of the debtor. Although Jordan's plans must conform with FERC's judgment regarding public policy and public interest, Jordan is engaging in a private enterprise venture. The important purposes behind the Bankruptcy Court's exclusive jurisdiction over the dams, 11 U.S.C. § 711, and its Restraining Order should not fade in the presence of a private third party's business venture merely because that third party must secure government licenses as a prerequisite to his business venture's success.

An essential purpose behind the Bankruptcy Court's exclusive jurisdiction over the debtor and its property is the centralization of all matters concerning the debtor in one court. *Bohack Corp. v. Borden, Inc.,* 599 F.2d at 1164. Requiring Jordan to petition the court and show cause for relief from the Restraining Order or to await the sale of the dams by the debtor before acquiring permits and licenses does not infringe upon FERC's jurisdiction, since FERC retains complete authority over the licensing of persons who properly apply. For example, the court could not have allowed the debtor to begin generating hydroelectricity without FERC's approval. Allowing FERC to decide whether Jordan's efforts would improperly interfere with the debtor's estate would be detrimental and contrary to purposes of the court's exclusive jurisdiction over the debtor and its property. Furthermore, FERC has no expertise, much less authority, in bankruptcy matters. The regulations require a preliminary permit or license applicant to submit certain information to FERC. None of this required information involves the existence of a Chapter XI debtor who may face frustration of his attempt to obtain an arrangement with unsecured creditors or, at least, the prolonging of the Chapter XI proceeding if FERC begins the time-consuming task of determining the propriety of a permit and, subsequently, a license. 18 C.F.R. §§ 4.51 & 4.81. Finally, requiring Jordan to seek relief from the Restraining Order or to await the sale of the dams by the debtor or the conclusion of the Chapter XI proceeding does not defeat the interests of the public in comprehensive hydroelectric development. Nothing exists preventing Jordan's applying for and acquiring the licenses so long as he follows the correct procedures (unless FERC ultimately decides that he should not receive licenses). By not following proper procedures Jordan has prolonged his own efforts and the Chapter XI proceeding.

Inasmuch as appellant Jordan knowingly violated the Bankruptcy Court's July 13, 1979, Restraining Order by applying for preliminary permits and licenses with FERC,

IT IS, THEREFORE, ORDERED that the Bankruptcy Court's Contempt Order of June 28, 1982, is AFFIRMED with the following modifications:

(1) Appellant Jordan shall be, and hereby is, fined $10,000 for civil contempt of the Bankruptcy Court. This fine shall be remitted upon Jordan's purging himself of civil contempt by presenting to the Court within fifteen (15) days of the entry of this Order satisfactory evidence that he has taken the necessary steps to withdraw his license applications. Upon Jordan's failure to present such evidence within the fifteen (15) day period, Jordan shall be fined an additional $500.00 per day, for the use and benefit of the debtor, for each day he fails to present such evidence.

(2) Jordan may resubmit license applications upon the termination of the Bankruptcy Court's jurisdiction over the dam(s) or upon the Bankruptcy Court's order permitting him to file applications.

(3) While the preliminary permits issued by FERC are null and void *ab initio,* FERC may afford to any such renewed license applications of Jordan mentioned in paragraph (2) above, whatever processing it determines in its judgment to be appropriate, consistent with the Federal Power Act and its regulations.