BENTON et al. v. UNITED STATES et al.
Civ. No. 1028.

United States District Court
M. D. Georgia, Macon Division.
Aug. 24, 1953.

Charles J. Bloch, and Denmark Groover, Jr., of Bloch, Hall, Groover & Hawkins, Macon, Ga., for the plaintiffs.

John H. D. Wigger, Special Asst. to Atty. Gen., Washington, D. C., Frank O. Evans, U. S. Atty., Milledgeville, Ga., for the United States.

C. H. Johns, Asst. Chief Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

A. R. Lawton, T. M. Cunningham, George O'Donnell, John B. Miller, of Lawton & Cunningham, Savannah, Ga., Gen. Walter A. Harris, Harris, Russell, Weaver & Watkins, Macon, Ga., for Central of Georgia Railway Co.

W. Walter Douglas, Douglas, McWhorter & Adams, Savannah, Ga., for Savannah Widows Society, et al.

Before RUSSELL, Circuit Judge, and DAVIS and CONGER, District Judges.

CONGER, District Judge.

The plaintiffs in this case are stockholders of the Southwestern Railroad Company. The defendants are the Interstate Commerce Commission and the United States of America. The plaintiffs are relatively few in number and possess a comparatively small amount of stock. As a matter of fact, the statement was made, in the argument, and uncontroverted, as far as I recall, that the plaintiffs consist of only eight of the more than five hundred shareholders, and own less than two (2%) per cent of the capital stock. By this statement, there is no intention to infer, or even intimate, that the plaintiffs did not have a perfect, absolute right to institute and maintain all litigation, which they deemed appropriate, in both the State and the Federal courts, including the instant suit, and resist, to their utmost, any illegal encroachments against their property and any rights or interest therein.

This is an action seeking to set aside, annul, declare invalid and enjoin the enforcement of an order and report of the Interstate Commerce Commission dated March 2, 1953, which approved an application filed by the Central of Georgia Railway Company under Section 5(2) of the Interstate Commerce Act, as Amended, 49 U.S.C.A. § 5, par. (2), for authority to acquire control of the Southwestern Railroad Company through the purchase of a majority of the latter's capital stock, at a price of $75 per share.

While not necessary to a clear understanding of the issues here involved, a brief resumé of the high lights of the history of the Southwestern Railroad Company, and its long and intimate relation to the Central of Georgia Railway, and the court house battles and the long and arduous litigation, of which the present case ought to be a climax, is somewhat significant and intriguingly interesting.

The Southwestern Railroad Company is an ancient organization, as we regard financial institutions in this section, and has been for many years, and is now, valuable property. It was incorporated by an Act of the Legislature of the State of Georgia under date of December 27, 1845. Its record and prosperity have kept step with the condition of the time through which it has passed.

The Southwestern Railroad Company came into existence and began operations before the hot and acrimonious debates, and the flare of tempers, with reference to the question of slavery, which utlimately resulted, indirectly, at least, in secession, and finally the War between the States. It operated successfully as an independent railroad until June 24, 1869, when the economic conditions resulting from the War

between the States, and the reconstruction period following, made it mandatorily advisable to cease operations, and on that date, its properties were leased to the Central Railroad & Banking Company, for the existence of its charter. About twenty-five years later, the Central Railroad & Banking Company was placed in the hands of a receiver, out of which receivership, the Central of Georgia Railway Company emerged, and on October 17, 1895, the Southwestern Railroad Company leased its road and properties to the Central of Georgia Railway Company for the term of one hundred and one years, with renewal on like terms forever. The lease agreement required the lessee to pay the lessor $259,500 annually, which was equal to five (5%) per cent dividend on the par value of Southwestern stock.

This arrangement was kept in force and effect until June 19, 1940, notwithstanding the Central of Georgia had been placed in the hands of a receiver on December 19, 1932. On the former date, to-wit, June 19, 1940, the Central of Georgia Railway Company filed a petition in the District Court of the United States, alleging and admitting its inability to pay its debts, and desired to file a plan for reorganization, under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Thereupon, trustees were appointed. On the date of the bankruptcy, lessee was in arrears with its lease obligations, which were ordered paid, in installments, by the Bankruptcy Court.

On September 13, 1940, the trustees of the Central of Georgia Railway Company agreed with the officials of the Southwestern Railroad Company with respect to the operation of the latter's property, under a plan promulgated by the Interstate Commerce Commission and approved by the court, and generally referred to as the segregation or bankruptcy formula. This formula superseded the rental agreement and provided for rental payments, on a net income basis set forth in the plan. This operational arrangement under the agreed plan and formula continued until July 1, 1943. During the period under which this plan was in effect, the operations were very successful. Money was plentiful and business was good.

On July 1, 1943, the lease payments under the bankruptcy formula of September 13, 1940, were terminated, and the relationship between the lessor and the lessee reverted to the fixed rental plan of 1895.

On June 25, 1946, the Bankruptcy Court approved a plan of reorganization which was authorized by the Interstate Commerce Commission. The plan provided that the Central of Georgia Railway Company acquire the properties and assets of the Southwestern Railroad Company, and in payment therefor would deliver to the Southwestern Railroad Company $2,200,000 First Mortgage four (4%) per cent Bonds, Series A, and $1,770,000.00 of four and one-half (4½%) per cent Bonds, Series B, to be issued by the reorganized Central of Georgia Railway Company.

On March 13, 1947, the directors of the Southwestern Railroad Company accepted the proposed plan of reorganization of the Central of Georgia Railway Company, subject to the assent of a majority of the Southwestern stockholders. Thereupon, the plaintiffs in this case, and others, filed a suit in Bibb County, Georgia, Superior Court, seeking to temporarily restrain and permanently enjoin the officers of the Southwestern Railroad Company from conveying the railroad properties to the Central of Georgia Railway Company, in exchange for the bonds offered. The basis of the injunctive relief sought, in that case, was predicated on the assertion that, under the charter of the Southwestern Railroad Company its properties could not be sold, except by unanimous affirmative vote of its stockholders. On March 28, 1947, while the injunction suit was pending in the State Superior Court, the stockholders of the Southwestern Railroad Company voted 30,000 to 9,000 to accept the reorganization plan.

On April 18, 1947, Judge Scarlett, of the Bankruptcy Court, enjoined the plaintiffs in the State court proceedings from prosecuting that action. Six days later, Judge Atkinson, of the State court, enjoined the Southwestern Railroad Company and its

officers from conveying its properties to the Central of Georgia Railway Company. August 15, 1947, Judge Scarlett annulled and set at naught the injunction granted by State Court Judge Atkinson, and enjoined the State court from further proceeding in the premises. From this order and judgment, an appeal was made to the Fifth Circuit Court of Appeals, where, on January 13, 1948, the judgment of the District Court was reversed and the injunction was dissolved, Benton v. Callaway, 165 F.2d 877. On certiorari to the Supreme Court of the United States, the Fifth Circuit Court of Appeals was affirmed on February 7, 1949, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553. While the issues involved in the Federal Court were being litigated and determined, the State court proceedings remained on the docket, but dormant.

After the decision of the United States Supreme Court, Judge Atkinson, of the State court, on December 5, 1949, entered an order permanently enjoining the officers of the Southwestern Railroad Company from selling its properties to the Central of Georgia Railway Company. On appeal, the State Supreme Court affirmed, South Western R. Co. v. Benton, 206 Ga. 770, 58 S.E. 2d 905, and certiorari to the United States Supreme Court was denied October 9, 1950, 340 U.S. 815, 71 S.Ct. 44, 95 L.Ed. 599. Thus endeth that feature of the litigation.

In the meantime, the properties of the Southwestern had continued to be operated by the Central. The operation was under the fixed lease and agreed formula up to, and through, June 30, 1948. On March 5, 1948, the United States District Court for the Southern District of Georgia passed an order rejecting the lease of the Southwestern Railroad Company as of the consummation date of the reorganization plan. Among other things, the order provided that "On and after the consummation date, the reorganizing Company shall operate the lines of the Southwestern for the account of the Southwestern, subject to the jurisdiction of this court." No dividends have been paid the stockholders since that date.

January 16, 1951, the Central of Georgia Railway Company applied to the Interstate Commerce Commission for authority to acquire control of the Southwestern Railroad by purchase of a majority of its stock at $75 per share, on the terms and conditions set forth in its depositary agreement of January 1, 1951. Numerous hearings were held, testimony was introduced, and the respective contentions were argued orally before Division Four of the Commission.

On March 4, 1952, the Commission made a report in which it discussed the history of the respective railroads and their subsidiaries and branch lines, detailing the property owned by the Southwestern and giving total valuation data. It also discussed the litigation hereinbefore set forth, the price range of the Southwestern stock, the contribution of freight traffic by the Southwestern and the Central, the financial result of Southwestern operations, conditions and betterments, and concluded that the Central of Georgia Railway Company was the logical carrier to control the Southwestern; that the two properties are entirely complementary and not competitive; that the Central had operated the Southwestern since 1869, either as lessee or through the Bankruptcy Courts. The Commission pointed out that it does not appear that the Southwestern could be operated to greater advantage or more economically by any carrier than by the Central of Georgia; that under the Central's control, adequate transportation service to the public would be assured. It was further pointed out that the Southwestern is in no position to undertake the immediate operation of its railroad; that it owns no equipment or shops, and has no operating or accounting organization. The Commission further pointed out that no other carrier had evinced any interest therein, and that the acquisition of control of the Southwestern by the Central would be consistent with the public interest. The Commission reiterated in its report of March 4, 1952, that "We are of the view that it would be in the public interest to have the Central acquire, at a price, which we found to be just and reasonable, so much of Southwestern stock as is made available to it." The Commission, while finding and reporting in its first order that the acquisition of control of the Southwestern by the Central would be in

the public interest, deferred a finding of value "pending supplementation of the record to afford an adequate basis for determining just compensation to the stockholders for the stock."

The matter of investigation, ascertainment of facts and all other pertinent and applicable questions were submitted to an examiner with reference to whether or not $75 a share, offered by the Central of Georgia, was an adequate price for the stock. The examiner made a favorable report, and exceptions were filed by the plaintiffs in this case, and the issues were submitted to and orally argued before the Commission, on January 2, 1953. The Commission made a report on March 2, 1953, in which it referred to its previous report of March 4, 1952, and in which it stated: "The sole question to be determined herein is whether the $75 a share offered by the Central is an adequate price for the stock to be acquired."

Many facts and figures were used and a very thorough investigation was made in order to determine that question. The value of the Southwestern was considered as an operating and a non-operating property; its earning possibilities were considered in both capacities; the condition of the physical properties was examined and discussed; the relationship of the Southwestern to the Central was considered, and the conclusion was reached by the Commission "that the value of the stock of the Southwestern, if independently operated, is less than $75 per share, but, if operated as a part of applicant's system, it is worth that price to the applicant."

As before stated, this action was brought to set aside, cancel, annul and enjoin the enforcement of the order and report of the Interstate Commerce Commission dated March 2, 1953, which approved the application of the Central of Georgia Railway Company to acquire control of the Southwestern by purchase of a majority of its capital stock at $75 a share.

The plaintiffs set forth in their complaint innumerable reasons and grounds wherein they contended that the Commission committed error in allowing and permitting, by order, the Central of Georgia to acquire majority stock ownership of the Southwestern. They also set forth numerous considerations and reasons which they contended the Commission did not take into account in arriving at its conclusions, which, if given proper consideration, would have required findings and conclusions coinciding with plaintiffs' contentions. In the lengthy, but interesting, argument for the plaintiffs, it seemed to me that the gist of their grievance and the uppermost ground on which they based relief was that the Commission did not have facts upon which to predicate its findings of value, and that it could not do so as a matter of fact until a proper formula had been determined and applied to the operations of the Southwestern by the Central since July 1, 1948.

The Central of Georgia and the Interstate Commerce Commission took the position, or at least apparently assumed, that after the disaffirmance of the lease by the Bankruptcy Court on March 5, 1948, the method of ascertaining and allocating the earnings of the Southwestern would be the so-called segregation or bankruptcy formula.

The plaintiffs contend that that formula was an agreed one, although promulgated by the Interstate Commerce Commission and approved by the court, and that after the disaffirmance of the lease, no formula had been arrived at or agreed upon with reference to establishing and allocating earnings to the Southwestern. The plaintiffs further contend that since no formula had been provided or agreed upon by the parties or promulgated by the Commission or ordered by the Court, that no such formula was in existence, and that the Commission could not arrive at just value or just compensation without the prior establishment of a formula for revenue and allocation.

The defendants took the position that despite the numerous specifications of alleged error committed by the Commission, that the essential determination of the case resolves itself into two issues: First, do the plaintiffs have standing to maintain this action; and, secondly, assuming that the plaintiffs have such standing, are the conclusions of the Commission, that the ac-

quisition of control of the Southwestern by the Central of Georgia is consistent with the public interest, and the terms of the acquisition are just and reasonable, supported by the findings and the evidence of the record?

The plaintiffs do not primarily rely on the failure of the Commission to correctly interpret the facts, although numerous specifications of error are alleged. They seem to me to rely chiefly and primarily on the ground that the Commission arrived at the value without any facts upon which to predicate its conclusions. In other words, plaintiffs contend that the bankruptcy formula did not apply, and should not have been applied, after the disaffirmance of the lease. They contend that there was no method by which to arrive at earnings, which is a primary factor of value, and, therefore, lacking any formula, there was no method by which to arrive at value. They argue that it is not a question of scarcity of facts, but lack of facts,—not a vague formula, but no formula, all of which, predicated on plaintiffs' assumption that after the disaffirmance of the lease and the operation of the property under order of the court, for the account of the Southwestern, no formula or plan has been devised, agreed upon, promulgated or ordered by which any one, including the Commission, could determine the earnings of the Southwestern, which, as has already been said, is a primary factor in determining value.

It is true, as contended by the plaintiffs, that the order of Judge Scarlett of March 5, 1948, did not set forth a definite plan or formula for determining the earnings of the Southwestern. The order simply stated "that the operation was to be for the account of the Southwestern and subject to the jurisdiction of the court." The Central of Georgia did what appears to be a rather reasonable thing in reverting to the segregation formula, and while the Southwestern did not agree or concede that it was either applicable or correct, it was advised by the Central of Georgia that the earnings of the Southwestern would be determined in that manner, from which there was no serious or legal protest.

This lengthy, stubbornly contested case could, in my judgment, be brought to an abrupt conclusion, so far as this Court is concerned, simply by adjudging that the plaintiffs' complaint does not set forth, and the record does not disclose, that they have legal rights which have been violated by the order of the Interstate Commerce Commission, and, therefore, have no standing in this Court. There is a vast difference between the right to intervene in a proceeding before the Interstate Commerce Commission and a right to bring a suit to set aside an order of that Commission. The Circuit Court and the Supreme Court have many times recognized this distinction. Simply because plaintiffs were intervenors in a hearing before the Interstate Commerce Commission does not give them standing in a court of law. Nor would the fact that they did not intervene prevent them from attacking an order of the Commission, if it violated some legal right which would result in actual or threatened damage. The difference between the right to intervene in a hearing before the Commission and the right to bring a legal proceeding is broad. Although the Commission has semi-judicial powers, it is primarily administrative. The interest frequently before the Commission is commercial, public, or quasi-public, but in order to maintain an action in court, it is necessary to show an infringement of some right which will result in injury or damage. We do not believe that the plaintiffs have shown such right. The order of the Commission was permissive only. The Commission did not undertake in the slightest degree to compel, either directly or indirectly, the plaintiffs or any of the stockholders to sell to the Central of Georgia, or to any third person, at $75 a share or any other price. The Commission simply granted the Central of Georgia permission, if it could, to acquire control of the Southwestern by the purchase of a majority of the stock at $75 per share. These plaintiffs were not required to sell their shares of stock. They may retain them, and they will have their rights as minority stockholders, and if the majority infringes on those rights, they have a remedy at law.

■ The courts are unanimous in holding that in order for a person to be in position to maintain a complaint to set aside an order of the Commission, he must show that he has a legal right or interest that will be injuriously affected by the order. Moffat Tunnel League v. United States, 289 U.S. 113, 119, 53 S.Ct. '543, 545, 77 L. Ed. 1069, 1073. In order to set forth a cause of action "the complaint must show that plaintiff has, or represents others having, a legal right or interest that will be injuriously affected by the order." Moffat, supra. See, also, Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 44 S.Ct. 72, 68 L.Ed. 216; Alexander Sprunt & Son v. United States, 281 U.S. 249, 50 S. Ct. 315, 74 L.Ed. 832; Pittsburgh & W. V. R. Co. v. United States, 281 U.S. 479, 50 S. Ct. 378, 74 L.Ed. 980.

Believing and proclaiming that in my view plaintiffs have no standing, I am not content, however, to predicate a decision on that narrow point. I believe that some pronouncement should be made by the Court with respect to whether or not the conclusions of the Interstate Commerce Commission that the acquisition of control of the Southwestern by the Central of Georgia is consistent with public interest and that the price offered for the stock is just and reasonable, are supported by the facts in the record.

■ I have already stated that in my judgment this case might have been terminated by holding that the plaintiffs have no standing. I might state additionally, that it appears to me the case might be terminated by a statement, that under the facts as disclosed by the record and under the applicable law, this Court is without power or authority to annul, enjoin, or even question the order of the Commission, for the reason that the order is amply supported by the facts in the record, and if so supported, the determination of what is in the public interest, and what is just and reasonable, are in the sole province of the defendant Commission. In Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 761, 83 L.Ed. 1147, the Supreme Court said: . "This Court 'ascribed' to the findings of the Commission 'the strength due to the judgments of a tribunal appointed by law and informed by experience.' Recognition of the Commission's expertise also led this Court not to bind the Commission to common law evidentiary and procedural fetters in enforcing basic procedural safeguards." Thus evolved "the doctrine of administrative finality. Even when resort to courts can be had to review a Commission's order, the range of issues open to review is narrow. Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable." In Virginian Railway Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 225, 71 L.Ed. 463, the Supreme Court in referring to the reasonableness of rates said: "The finding of reasonableness, like that of undue prejudice, is a determination of a fact by a tribunal 'informed by experience.' Illinois Cent. R. Company v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128. This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it." In Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 764, 83 L.Ed. 1147, the Supreme Court said: "Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand. Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. 'The judicial function is exhausted when there is found to be a .rational basis for the conclusions approved by the administrative body.' Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 693, 694, 78 L.Ed. 1260. In the Mississippi Valley case, supra, the court states: "The

findings in the report being thus accepted as true, there is left only the inquiry whether they give support to the conclusion. Quite manifestly they do. The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the Commission by training and experience is qualified to form. [State of] Florida v. United States, ante, 292 U.S. [page] 1, 54 S.Ct. 603, 78 L.Ed. [1077] * * *. It is not the province of the court to absorb this function to itself. I. C. C. v. Louisville & Nashville R. Co., 227 U.S. 88, 100, 33 S.Ct. 185, 57 L.Ed. 431; Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." [292 U.S. 282, 54 S.Ct. 694]

The above authorities demonstrate the very narrow and almost nonexistent latitude the court has in upsetting or enjoining as illegal the finding and report of the Interstate Commerce Commission. I repeat that I do not believe the plaintiffs established themselves in the narrow limits fixed by law so as to warrant this Court in inquiring into, much less upsetting, the order of the Commission, which seems to be planted on a rational basis.

■ However, I think the question of value of the stock as found to be fair and reasonable by the Commission ought to be discussed. The plaintiffs did not seriously contend before the Court in their oral arguments, nor in their briefs, that the Commission erred in declaring that the acquisition of control of the Southwestern by the Central would be in the public interest, nor do they seriously contend that this determination, made by the Commission, in an administrative capacity, is subject to review or should be upset. They seem to concur, more or less, by silent acquiescence, that the determination of whether or not the acquirement of control of the Southwestern by the Central is in the public interest should be left to the tribunal of experts, informed and experienced men, in

that field. If I have misconstrued or misinterpreted their position with respect to this question, and they urged a contrary view, I would still be of the opinion that this is a question for the Interstate Commerce Commission, in the exercise of the power vested in it. It is to the finding of the Commission that $75 is a fair and reasonable value of the stock of the Southwestern that the plaintiffs make serious objection, and with respect to which they allege innumerable errors in arriving at such finding.

Heretofore, reference has been made to the relative number of stockholders and the number of shares owned by the two groups of stockholders, that is, those wishing to sell and those wishing not to sell. I would like to advert briefly again to that topic, not because a decision, or even a discussion, is necessary to a determination of the issues here involved. If the plaintiffs were required to sell, against their will, that not only would be a horse of another color, but an entirely different horse. They not only object to selling, but they protest against the sale by those who wish to sell, and seek by injunction a decree, from a court dealing in equity, denying them the right to sell.

■■ This is not a suit directly or indirectly by minority stockholders to protect their rights which are being invaded or suppressed by the majority. There is no suggestion that the majority stockholders are acting in bad faith, that they are dissipating the assets of the corporation or that they are using their majority power in their own interest and in disregard or detriment of the interest of the minority. If this were a minority stockholders' suit, based upon fraudulent, ultra vires or other illegal acts of the majority, the situation would be different. Minority stockholders, generally speaking, do not have many rights, but such as they have must be safeguarded and vindicated. It must be kept in mind that when a person becomes a stockholder in a corporation, he assents to majority rule and impliedly agrees to abide thereby. In this case, the evidence discloses that the preponderant majority of the stockholders were agreeable to, and its di-

rectors voted for, the reorganization plan, which could not be consummated because of the minority's protest and the provisions of the charter. The evidence further disclosed that a great majority of the stockholders not only wish, but are anxious, to sell their stock to the Central of Georgia Railway Company under the depositary agreement. While it is true that the minority have a perfect right to be heard and to pursue such legal proceedings as they may deem appropriate, they should, however, recognize the fundamental rule that a minority of stockholders of a corporation should not be able to bind and hold a majority to an unprofitable and hopeless enterprise. The Commission very aptly, and I think correctly, stated: "We recognize that intervenors should not be permitted to thwart the wishes of a large majority of stockholders who voluntarily desire to sell their stock at the price offered."

The plaintiffs insistently complain that the Interstate Commerce Commission used as a yardstick, for the determination of the value, the old segregation or bankruptcy formula. They contend, that after Judge Scarlett's order of March 5, 1948, there was no agreement with respect to the old segregation formula or any other formula, or any other plan, nor did the court prescribe any method or promulgate any rule It is true that the Commission refers to the segregation formula and used it as one of the criteria in arriving at the value of the stock, but, in addition, the record discloses that the Commission took into consideration and discussed the value of the stock on the open market; and the amount of bonds and dividends the stockholders would have received under the reorganization plan, and the earning capacity of the Southwestern, tied in with and as a part of the Central System, and operated independently, and the further fact that it had no operating equipment or personnel, and the probable depressing effect of the long, drawn-out, extended litigation. In arriving at the stock value, the Commission had to consider the effect both on the seller and the buyer. It should not have authorized the acquirement by the Central of Georgia of the Southwestern stock at a value less than fair and reasonable, but at the same time it was charged with the duty of seeing that the Central of Georgia did not pay a sum that would so burden it as to impair its financial standing, and, consequently, jeopardize the transportation service which it owed to the public. If the Commission used an erroneous standard or yardstick by which to adjudge just and reasonable value, it was a matter peculiarly within the province of the Commission and with respect to which this Court has no power. This Court cannot concern itself with the type of yardstick used or the method employed, if it is reasonable and supported by the evidence. This Court can only step in, when petitioned, where there is no yardstick or the method is palpably unjust and unreasonable.

In the case of Chicago, B. & Q. R. Co. v. United States, D.C., 60 F.Supp. 580, 585, in discussing the phrase "reasonableness and the choice of standards," the court said: "The determination of the issue of fact in respect to reasonableness as well as the choice of the standard upon which the determination is to be made in each particular case, is left to the informed judgment of the Commission, a body 'experienced in such matters and familiar with the complexities, intricacies, and history of rate-making in each section of the country,'" citing Louisville & N. R. Co. v. United States, 238 U.S. 1, 35 S.Ct. 696, 59 L.Ed. 1177; Virginian Ry. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Youngstown Steel & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553.

In the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 590, 64 S.Ct. 281, 287, 88 L.Ed. 333, the Supreme Court said: "We held in Federal Power Commission v. Natural Gas Pipeline Company [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037] supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. [736], at page 743, 86 L.Ed.

1037 [1049]. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. [736] at page 743, 86 L.Ed. 1037. Under the statutory standard of 'just and reasonable' it is the result reached, not the method employed which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180, [1191, 1192, 1197]; West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761, [768]; West v. Chesapeake & P. Teleph. Co., 295 U.S. 662, 692, 693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 [1657, 1658] (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

■ The appropriateness of a formula or the method used is left to discretion and becomes a question of fact and not a question of law.

In the case of Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 833, 89 L.Ed. 1206, the Supreme Court said: "Under this Act the appropriateness of the formula employed by the Commission in a given case raises questions of fact not of law."

■ In the case of United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 698, 90 L.Ed. 821, the Supreme Court succinctly stated the functions of judicial review of the Interstate Commerce Commission's determinations, and said: "We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that '* * * the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

■ We believe that the conclusions reached by the Interstate Commerce Commission, an administrative body with power to act, were predicated on a rational basis. We feel that the Commission's investigation was broad, thorough and exhaustive, and, in the language of the Supreme Court in the Mississippi Valley case, "In this instance the care and patience with which the Commission fulfilled its appointed task are plain, even to the casual reader, upon the face of its report." [292 U.S. 282, 54 S.Ct. 694]

Whereupon, It Is Ordered and Adjudged That the plaintiffs' prayers for relief are denied, the temporary restraining order heretofore granted is dissolved, and the complaint is dismissed.

RUSSELL, Circuit Judge, concurs in the judgment.