W. H. B. SIMPSON, Lucy C. B. Simpson, Mary Elizabeth Simpson, T. H. Bowden, Ansel M. Smith, Belk-Simpson Company of Abbeville, South Carolina, Inc., Belk's Department Store of Clinton, South Carolina, Inc., The Greenville Bargain House, a corporation of the State of South Carolina, Plaintiffs,

v.

SOUTH WESTERN RAILROAD COM-PANY, and Central of Georgia Rail-way Company, Defendants.

Civ. A. No. 1156.

United States District Court,
M. D. Georgia, Macon Division.

Jan. 11, 1955.

Bloch, Hall, Groover & Hawkins and Charles J. Bloch, Macon, Ga., for plaintiffs.

John B. Miller, Savannah, Ga., Harris, Russell, Weaver & Watkins, and H. D. Russell, Macon, Ga., for defendants.

BOOTLE, District Judge.

This case came on to be heard upon motion to remand and was duly heard both upon oral argument and by briefs.

This case presents a new chapter in a long story of litigation between certain stockholders of the South Western Railroad Company on the one hand and the Central of Georgia Railway Company on the other. The previous chapters in that story are very interesting and appear chronologically as follows: Benton v. Callaway, 5 Cir., 1948, 165 F.2d 877; Callaway v. Benton, 1949, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553; South Western R. Co. v. Benton, 1950, 206 Ga. 770, 58 S.E.2d 905, certiorari denied, 1950, 340 U.S. 815, 71 S.Ct. 44, 95 L.Ed. 599; Benton v. United States, D.C.M.D.Ga.1953, 114 F.Supp. 37, 39.

In the case last cited, Judge Conger, writing for a three-judge court, gave "a brief résumé of the high lights of the history of the South Western Rail-

road Company, and its long and intimate relation to the Central of Georgia Railway, and the court house battles and the long and arduous litigation, of which the present case ought to be a climax * * *." As Judge Conger stated, that history is "significant and intriguingly interesting."

In considering this motion to remand, however, this Court can consider only such portions of that long and interesting history as appear in the petition filed in the state court. The allegations of the petition must be examined against the background of Title 28, Section 1331 of the United States Code to see whether the petition states a cause of action which "arises under the Constitution (or) laws * * * of the United States" and against the background of Section 1336 to see whether the petition states a cause of "action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission."

 In construing the petition, we must, of course, consider all documents and exhibits annexed thereto and forming part thereof the same as the formal allegations of the petition. State of Louisiana ex rel. Saint v. Morgan's Louisiana & T. R. & S. S. Co., D.C. W.D.La., 18 F.2d 645.

The petition was filed in the Superior Court, Bibb County, Georgia, by W. H. B. Simpson, Lucy C. B. Simpson, Mary Elizabeth Simpson, T. H. Bowden, Ansel M. Smith, Belk-Simpson Company of Abbeville, South Carolina, Inc., Belk's Department Store of Clinton, South Carolina, Inc., The Greenville Bargain House, a corporation of the State of South Carolina against the South Western Railroad Company, hereinafter called the South Western, and the Central of Georgia Railway Company, hereinafter called the Central. The petition is, in length, consistent with the long litigation which has gone before. It comprises thirty-one pages and is documented with nineteen pages of exhibits. It traces all of the former litigation and

negotiations concurrent with that litigation and subsequent thereto.

The petition makes the following case:

The capital stock of the South Western is $5,191,100, all common with par value of $100 per share. Petitioners own 664 shares (a little more than 1 per cent). The Central owns or claims to own 50,368 shares.

The South Western comprises some 340 miles of railroads, bridges, depots, and appurtenances in the heart of the system of the Central.

On December 19, 1932, the properties of the South Western were being operated by the Central under a long-term lease at a rental authorizing South Western to pay its stockholders an annual dividend of 5 per cent. On that date the District Court for the Southern District of Georgia appointed a receiver for the assets of the Central. The receiver adopted the lease of South Western and continued operation of both railroads.

On June 19, 1940, the Central filed its petition under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and trustees in bankruptcy were appointed. The trustees by contract with South Western adopted the lease on a modified basis, agreeing to pay in lieu of rental the net income of the leased property, and to guarantee South Western against losses and expenditures for additions and betterments in excess of $50,000 per annum. The net income of the leased properties for the period June 19, 1940, to July 1, 1943, was determined by a segregation formula, or bankruptcy formula, promulgated by the Interstate Commerce Commission (252 I.C.C. 587) and approved by the District Court on August 19, 1943.

The contract between the trustees of the Central and the South Western was terminated July 1, 1943, and thereafter the trustees of Central adopted the South Western lease for the duration of the bankruptcy.

A plan of reorganization of the Central was promulgated by the Interstate

534

Commerce Commission and was approved by the Bankruptcy Court June 24, 1946. That plan allotted to South Western $2,200,000 of the first mortgage 4 per cent series A bonds and $1,770,000 of 4½ per cent income bonds series B of the reorganized company in exchange for all of the said leased properties.

The South Western stockholders in March, 1944, 1945, and 1946 rejected the plan as grossly unfair and inadequate.

On February 11, 1947, the Interstate Commerce Commission submitted the plan to creditors and leased lines for acceptance or rejection on or before midnight, March 28, 1947.

On March 13, 1947, the directors of South Western resolved that the plan be accepted subject to the assent by the holders of a majority of the South Western stock.

On March 25, 1947, L. O. Benton, Jr. and Charles J. Haden as stockholders of South Western filed in Bibb Superior Court their petition to enjoin the officers and directors of South Western from holding a stockholders' meeting on March 28, 1947, to consider said plan and, in the event such meeting should be held and a mere majority of the stockholders should approve the plan, to enjoin the directors from consummating it.

The Superior Court did not enjoin the meeting, and the stockholders on March 28, 1947, approved the plan by a vote of 30,137 shares to 9,057 shares.

The Judge of the Superior Court held hearings on March 26 and 27, 1947, and deferred his ruling upon request and agreement of counsel. On April 18, 1947, M. P. Callaway, trustee of the Central, filed in the Bankruptcy Court a petition against L. O. Benton, Jr., Charles J. Haden, and the South Western, praying that Benton and Haden be enjoined from further prosecuting their petition in the Superior Court, and on said date the District Court granted a preliminary injunction as prayed.

On April 24, 1947, the Judge of the Superior Court of Bibb County, Georgia, of his own motion issued an interlocutory injunction against the defendants in the state court, basing his ruling on the ground that South Western had no charter power to sell its railroad without unanimous consent of the stockholders.

On August 15, 1947, the District Court made its injunction permanent and also annulled the interlocutory injunction granted by Bibb Superior Court on April 24, 1947. This action of the District Court was reversed by the United States Court of Appeals for the Fifth Circuit on January 13, 1948, Benton v. Callaway, 165 F.2d 877. This decision was upheld by the Supreme Court of the United States, Callaway, v. Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553.

Then the litigation in Bibb Superior Court proceeded to a permanent injunction on December 5, 1949, which was upheld by the Supreme Court of Georgia on April 10, 1950, in the case of South Western R. Co. v. Benton, 206 Ga. 770, 58 S.E.2d 905, and certiorari was denied by the Supreme Court of the United States on October 9, 1950, 340 U.S. 815, 71 S.Ct. 44, 95 L.Ed. 599.

In the meantime, South Western's properties had continued to be operated by Central from December 19, 1932 to June 19, 1940, under the lease adopted by the receiver, from June 19, 1940 to July 1, 1943, under the segregation formula by the trustee, and from July 1, 1943 to July 1, 1948, under the lease by the trustee.

On March 5, 1948, the Bankruptcy Court had passed an order rejecting the lease of the South Western as of the consummation date of the plan, which was July 1, 1948, and provided that:

"From and after the consummation date the reorganized company shall operate the lines of the South Western for the account of the South Western, *subject to the jurisdiction of this court;* provided that, if the

properties of the South Western be acquired on the terms set forth in the plan subsequent to the consummation date and within a reasonable time after the termination of the litigation now pending, the effect of such acquisition shall be the same as if such properties had been acquired on such terms on the consummation date, and the result of operation by the reorganized company of South Western's railroads for the account of South Western, whether profit or loss, shall not affect the amount of bonds distributable under the plan to South Western Railroad Company, or the interest payable thereon from the consummation date."

The order of Judge Scarlett of March 5, 1948, did not prescribe any formula for determining the results of the operation. The properties had been operated under the segregation, or bankruptcy, formula from June 19, 1940 to July 1, 1943, and under the lease from July 1, 1943 to July 1, 1948.

Since the rejection of the lease by the District Court on March 5, 1948, as of July 1, 1948, there has been no agreement between the two railroad companies as to a formula under which the operations should proceed.

On October 24, 1950, a special meeting of the Board of Directors of South Western gave consideration to the status of South Western resulting from the litigation to that date and to what they would consider a proper formula to be applied to the operation subsequent to July 1, 1948, and authorized its President to employ William Wyer and Company to assist South Western in the preparation of such a formula. At that meeting, Mr. B. J. Tarbutton resigned as a director of South Western. Prior to October 24, 1950, the Vice President and General Counsel of South Western had written to the officers of Central stating that South Western was not conceding that the formula applied was the proper formula to be applied, nor that the formula had been correctly applied. These letters were written on December 28, 1949, March 10, 1950, and July 21, 1950.

At a meeting of the Board of Directors of South Western on December 21, 1949, the Vice President had been instructed to notify the Central that the report showing the results of operations of South Western by Central from July 1, 1948 to April 30, 1949 was neither acceptable so far as the formula was concerned nor as to the application of the formula, and that the Central's report was received as information only. Director Benton moved the adoption of the resolution and his motion was seconded by Director Tarbutton, who on October 24, 1950, had resigned as a director of South Western and was in January 1951 elected President of the Central.

Again on March 9, 1950, the directors of South Western directed its counsel to write a similar letter to Central regarding its statement of operations up to June 30, 1949, and to state that South Western did not concede that the formula applied was the proper formula to be applied, nor the correctness of the application.

The President of South Western notified its stockholders of the directors' action of October 24, 1950, and promised future notification as to any developments of importance which might result from the appointment of a negotiating committee on said date to negotiate with Central for sale or lease of South Western's properties, and to negotiate with other railroad companies looking toward the acquisition by such companies of South Western's properties.

On November 1, 1950, South Western's President called upon the General Counsel of Central and to his surprise learned from said General Counsel that it was not the intention of the Central to write a new formula, but that it was its intention to employ the formula used from June 19, 1940 to July 1, 1943, and that the question would be raised by the Central's billing South Western for the amount claimed to be due thereunder.

On December 5, 1950, a conference was held between the said negotiating com-

mittee and officials and counsel of the Central and further negotiations were subsequently held; but on January 16, 1951, the Central without any notice to the negotiating committee sent out directly to South Western's stockholders a letter proposal to purchase a majority of South Western's stock under the terms of a depositary agreement dated January 1, 1951, and subject to the approval of the Interstate Commerce Commission. No one of the petitioners deposited his or her stock or has agreed to sell it.

In the meantime, Congress by adoption of Section 441(j) of the Internal Revenue Code, 26 U.S.C. § 441(j), enhanced South Western's potential ability to pay a dividend.

On March 8, 1951, the annual meeting of South Western's stockholders was dominated by the Central through proxies obtained for that purpose. Director J. B. Ilges, Jr., of South Western had sold his stock and being no longer eligible resigned as a director. Director L. O. Benton, Jr., was displaced at said meeting.

At said stockholders' meeting of March 8, 1951, a resolution was introduced, the preamble of which recited that the Central contended that it was operating South Western's properties under the bankruptcy formula and that, therefore, a grave dispute and difference existed between the South Western and the present management of the Central, and that South Western's officers had correctly taken the opposite view to that of Central's officers. The resolving clause directed South Western's officers immediately to take such legal action as might be necessary to have this question judicially determined. When this resolution was offered, however, one of South Western's directors suggested that it might transpire that when Mr. William Wyer made his report to the directors, it would be inadvisable to take any legal action with respect to the formula, and the resolution was amended by adding thereto: "When and if the officers are advised by William Wyer * * * that, in his opinion, the so-called bankruptcy formula

is not a formula which should be applied to operations since July 1, 1948."

About the middle of May, 1951, Mr. Wyer told the Vice President and Counsel of South Western that he did not consider the formula fair and that if he were asked he would give his reasons therefor.

No legal action was ever taken to determine the question of the applicablility and fairness of the said formula, although petitioners and some other former stockholders of South Western steadfastly insisted upon such action.

On February 23, 1953, the directors of South Western transmitted to its stockholders a report that they were of the opinion South Western's welfare demanded a judicial determination of all controversies between the two railroads growing out of Central's operation of South Western for the past four years and eight months, and in which it was stated that the directors had authorized South Western's counsel to do whatever he deemed necessary to protect the interests of the stockholders. Nothing was done by said counsel.

On January 22, 1951, the Central applied for authority under Section 5(2) of the Interstate Commerce Act as amended, 49 U.S.C.A. § 5(2), to acquire control of South Western through a purchase of a majority of its capital stock.

On January 23, 1951, L. O. Benton, Jr., and Wallace Miller, who constituted the negotiating committee above mentioned, wrote a letter to South Western's stockholders stating, among other things, that the Central in its letter of January 16, 1951, to said stockholders offering to buy their stock for $75 per share had gone over the head of said committee and that, in said committee's opinion, said stock was worth more than $75 per share, pointing out that under the original plan of reorganization, taking into consideration the then market for Central's bonds, the value of a share of South Western stock under that original offer would be $87.05.

Certain stockholders of South Western intervened in objection to the grant of

the application of January 22, 1951 to the Commission and undertook to have the Commission require South Western to furnish information as to the value of its stock. South Western refused to arrange to furnish the information and the Commission refused to compel it to do so. On March 2, 1953, the Commission promulgated an order authorizing the Central to acquire control of South Western through ownership of a majority of its capital stock.

On March 20, 1953, pursuant to Title 28 U.S.C. §§ 1336, 2321 et sequentia, and Title 49 U.S.C.A. § 17(9), certain stockholders of South Western, including some of petitioners, filed in this Court their action to enjoin, set aside, annul and suspend the aforesaid order of the Commission. On August 24, 1953, a three-judge court filed its opinion and order in said case denying the prayers of the petition and dismissing the complaint. Benton v. United States, D.C., 114 F.Supp. 37.

Subsequently and by February 25, 1954, Central acquired by purchase at $75 per share approximately 97 per cent of South Western stock.

On February 25, 1954, Mr. Wallace Miller, then President of South Western, submitted to its stockholders a report of the affairs of the company showing that

Central was claiming against South Western:

| | |
|---|---:|
| Deficit in operation through July 31, 1953 | $ 557,001.72 |
| Additions and betterments through December 31, 1953 | 514,419.68 |
| Refund of taxes obtained by South Western for years 1947 and 1948 | 168,000.00 |
| | $1,239,421.40 |

Said report restated South Western's contention that the bankruptcy formula was not a proper or reasonable formula to be applied to the operations since July 1, 1948 to determine South Western's net income or loss from operations and that a judicial determination of all differences should be had to the end that the reasonable and fair rental value of Central's use and enjoyment of South Western's railroad since July 1, 1948 might be ascertained.

On March 11, 1954, at the annual meeting of South Western's stockholders, all its directors and its counsel were removed and replaced by Central's officers and counsel. At said meeting, seven individuals were elected to comprise the Board of Directors of South Western, each of whom was an officer, director, agent, or employee of the Central.

At said meeting, a resolution was adopted authorizing the execution of a contract for the operation of South Western's properties by the Central.[1]

---

1. Whereas:
 "1. This Company owns a railroad and has been given by the State of Georgia a franchise to operate it.
 "2. The Interstate Commerce Commission has found that it is in the public interest that said railroad be operated as a part of the system of Central of Georgia Railway Company, at the heart of which it lies.
 "3. The Supreme Court of Georgia has held that this Company may not sell its railroad and franchises to Central of Georgia Railway Company or to any other corporation except on the unanimous approval of this Company's stock-

holders, which it is obviously impossible to secure.
 "4. The operation of this Company's railroad by Central of Georgia Railway Company for the account of this Company has resulted over a period of approximately five and a half years, in annual operating deficits and large claims against this Company for Additions and Betterments put on this Company's railroad, so that this Company and its stockholders have received no income from the operation of its properties but have, on the contrary, incurred a large debt.
 "5. This Company desires to accomplish the continued operation of its prop-

Thereafter there was executed by the South Western and the Central an "operating agreement."[2]

Thereafter, on May 3, 1954, petitioners sent to South Western and to its president a letter pursuant to the provisions

erty in the public interest and in the fulfillment of its obligations to the State of Georgia and at the same time realize a reasonable revenue therefrom.

"6. This Company knows of no way to accomplish these things except by making an agreement with Central of Georgia Railway Company for the operation of this Company's property under terms and conditions which are satisfactory to both parties.

"7. Such an agreement cannot take effect until it has been approved by the Interstate Commerce Commission.

"8. An operating agreement which has the approval of the Central of Georgia Railway Company has been submitted to this Company for approval.

"It is, therefore

"Resolved, that the proper officers of this Company are authorized and directed to execute an operating agreement with Central of Georgia Railway Company in substantially the form submitted to this Company, a copy thereof being attached to and made a part of the minutes of this meeting; *provided* that said agreement shall not take effect until it has been approved by the Interstate Commerce Commission and by any administrative, or any judicial, body, having jurisdiction in the premises and shall, upon said approval, take effect as of midnight on December 31, 1953, and *provided further* that said agreement shall reserve to this Company the right of cancellation in the event that this Company should determine that it is financially able to operate its property and desires to do so."

2. The Interstate Commerce Commission, in its report approving said operating agreement, summarized its terms as follows: " * * * an agreement has been entered into between the applicant and the South Western providing that as of midnight December 31, 1953, subject to our approval, the applicant is appointed agent of the South Western to operate all of the latter's tangible real and personal property (except its cash, stocks, bonds, debentures, and other investment securities) which are, or may be used or useful, in connection with the operation of its railroad as a common carrier, together with the appurtenances thereto.

"Without affecting the generality of the property description, the agreement recites that included therein are all of South Western's tracks and the rights-of-

way therefor, its real property and the improvements thereon, its buildings on land which the South Western does not own, its terminal facilities and its depots, warehouses, and yards. The South Western also assigns to the applicant all of its right, title, and interest in all properties and facilities used singly or jointly by the South Western in its common carrier operations under agreements with other railroads, and also all of its right, title, and interest in any and all agreements, leases, and easements, which pertain to any of the South Western's property which is to be operated by the applicant.

"All the income from the operation of the South Western's properties is to be received by the applicant, and it will pay the former what amounts to a dividend of $3 a share on the portion of its stock other than that registered in the name of the applicant or affiliates, and such sums the South Western is to pay in dividends to the minority stockholders. The applicant waives dividends on the stock held by it. The proposed payment for dividends are predicated on a return of 4 per cent on $75 a share, the fair value of the stock as found by us in South Western R. Co. Control, supra. The applicant also is to pay the expenses incident to maintaining the South Western's corporate existence; all its taxes, except those chargeable to investment account, and except intangible taxes on its cash and investment securities, and income taxes on the income derived from such sources; all sums payable under existing agreements relating to the exclusive and joint use of any railroad facilities or appurtenances; and a sum equal to all charges and deductions allowed the South Western under the Internal Revenue Laws for amortization and depreciation of its property, and any other deductions allowed under such laws in the event of retirement or abandonment of its property on account of casualty, obsolescence or other causes not provided for through depreciation or amortization, less a sum equal to $3.00 multiplied by the number of shares of South Western stock which is held of record by stockholders other than the applicant or its affiliates. The effect of the contract is that the payment for depreciation and amortization plus the payment for dividend purposes will always equal the sum of all charges or deductions allowed the South Western under

of Section 22–711 of the Code of Georgia of 1933 requesting that said contract not be executed, if not already executed, because it is in reality a lease, not within the charter powers of the South Western and violative of its charter, because it is a transaction between the South Western and its majority stockholders which would be destructive of the company, because a majority of the stockholders are acting in their own interests in a manner destructive of the company, and because the majority stockholders were oppressively and illegally pursuing in the name of the corporation a course in violation of the rights of other stockholders; requesting also that, if executed, said contract be cancelled; asserting that the election of Mr. B. J. Tarbutton as President of South Western was illegal and contrary to the interests of South Western's minority stockholders because he was President of the Central and that his service would be an action of the majority stockholder in its own interest destructive of the company or of the rights of minority stockholders; requesting action compelling his resignation; requesting action compelling the resignation of the newly elected Board of Directors of South Western; requesting a judicial determination of all differences between the two railroads and insisting that the "double rent" statute of Georgia, Code, § 61–401, is applicable; and demanding that legal action be taken to determine whether the Central was correct in its contention that it was operating South Western's properties under the bankruptcy formula or the South Western correct in its opposite contention.

On or about May 13, 1954, petitioners received a reply signed by B. J. Tarbutton, President, advising that since the contract had been executed by direction of the stockholders it could not be cancelled except by direction of the stockholders and that he did not expect to call a stockholders' meeting for that purpose; that the Interstate Commerce Commission had authorized him to serve as President of both companies and he did not expect to resign; that the directors of South Western had also been authorized to serve and did not intend to resign; that since July 1, 1948, Central had been operating South Western's properties under order of the United States District Court for the Southern District of Georgia for account of the South Western Railroad Company and that no question of the rental value of these properties was involved; that the present management of South Western did not feel that the grounds on which South Western had earlier refused the Central's demand for payment for additions and betterments placed on South Western's properties were sound; that the South Western's stockholders resolution authorizing legal action against the Central had been passed on March 8, 1951, and that by the time Central's purchase of the majority of South Western's stock had been approved by the Commission, three years had elapsed without any such action being taken, and the present man-

the Internal Revenue laws for amortization and depreciation.

"Furthermore, the applicant is to pay all costs of maintenance and operation, keeping the property in as good order and repair as it was on the effective date of the agreement, ordinary wear and tear excepted, and will return the property to the South Western at the termination of the agreement, replacing such property as may have been consumed with use with property of equal value. The South Western is to reimburse the applicant for the cost of additions and betterments to the former's property, or the applicant may offset against their cost what it owes the South Western for depreciation, amortization, etc. The South Western will be indemnified by the applicant for any acts or omissions of the latter in operating the property. The agreement is to continue in effect for 1 year from midnight December 31, 1953, unless sooner terminated by South Western for failure to make rental payments, and from year to year thereafter. The South Western also may terminate the agreement at midnight of any December 31, on the ground that it is financially able to operate the property by giving 3 months' written notice thereof. Likewise, the applicant may terminate the agreement as of any such date upon 3 months' written notice.".

agement did not feel called upon to take that action.

On April 8, 1954, the District Court of the United States for the Southern District of Georgia entered an order rescinding a portion of its order of March 5, 1948, and providing in substance that when and if the Interstate Commerce Commission approved the application of the Central then pending in Finance Docket No. 18465 (application for authority to enter into the operating agreement) from the effective date of its order of approval, the Central would be relieved of the duty of operating the lines of South Western for the account of that company and subject to the jurisdiction of said Court.[3]

Thus ends the petition's allegations of fact. The remaining allegations set forth petitioners' reasons for feeling aggrieved. It is alleged, for instance, that the resolution of South Western's stockholders of March 11, 1954, authorizing the execution of the operating agreement was beyond the powers of the corporation and its stockholders and is void; that under the laws of Georgia a railroad corporation cannot without special authority of statute alienate its franchise or property whether by sale, mortgage, or lease; that said contract is ultra vires and void; that the execution of the contract and operations under it constitute such a transaction as will result in serious injury to South Western and its stockholders other than Central; that Central in procuring said contract and in operating under it is oppressively and illegally pursuing in the name of South Western a course in violation of the rights of the stockholders which can only be restrained by a court of equity; that petitioners have acted promptly and have made an earnest effort to obtain redress at the hands of the officers, directors, and stockholders of South Western; that until a judicial determination of all differences between Central and South Western is had, the continued operation under the contract should be restrained and enjoined by the Court; that until such determination, Central should be restrained and enjoined from disposing of any assets of South Western, and South Western restrained and enjoined from permitting, acquiescing in, or joining in such disposal; that petitioners are advised that bonds, notes and certificates of indebtedness of the value of $1,214,549.37 and cash in the amount of approximately $35,000 were on or about March 12, 1954 delivered by the retiring treasurer of South Western to the officers and directors elected at the meeting of March 11, 1954; and that if any of said securities or cash have been delivered to Central in satisfaction of any alleged indebtedness due it by South Western, Central should be required to restore such amount to South

---

3. "1. When and if the Interstate Commerce Commission approves the application of Central of Georgia Railway Company now pending before it in Finance Docket No. 18465, and on the effective date of its order of approval, the following portion of this Court's order of March 5, 1948 (Document No. 552) will be rescinded as of midnight on December 31, 1953:

" 'From and after the consummation date, the Reorganized Company shall operate the lines of the South Western for account of the South Western subject to the jurisdiction of this Court.'

"Central of Georgia Railway Company shall be relieved as of that date and without any further order of this Court of the duty of operating the lines of South Western Railroad Company for the ac-count of that Company and subject to the jurisdiction of this Court.

"2. When and if the Interstate Commerce Commission approves the aforesaid application of Central of Georgia Railway Company in Finance Docket No. 18465, and on the effective date of that order, Merrel P. Callaway shall be discharged as Trustee of the property of Central of Georgia Railway Company in these proceedings for the reorganization of that Company, and shall stand fully relieved of all liability as Trustee or individually for any acts or omissions of his performed or omitted in his capacity as Trustee, since the termination at 12:01 A.M. July 1, 1948, of the period in which he operated the properties and business of Central of Georgia Railway Company, as Trustee, pursuant to the authority of this Court."

Western pending a final determination of all such differences.

The prayers of the petition are that it be decreed that the "operating agreement" is ultra vires, null and void, and that the properties of South Western may not be operated by Central under its terms; that it be decreed that said agreement and operation under it will result in serious injury to South Western, petitioners and other stockholders similarly situated; that said agreement be cancelled; that it be decreed that said agreement and operation under it constitute a course oppressively and illegally pursued in the name of South Western by the majority stockholder, the Central, which course is in violation of the rights of petitioners and other stockholders similarly situated; that until a judicial determination of all differences between South Western and Central, arising out of Central's operation of South Western's properties, has been had to the end that the reasonable and fair rental value of Central's use and enjoyment of South Western's railroads since July 1, 1948, and in the future until further order of this court, has been ascertained, that the operation by Central of South Western's properties under the operating agreement be restrained and enjoined; that until such judicial determination Central and South Western be restrained and enjoined from disposing of or changing the status of any assets of South Western; that South Western render an accounting as to whether or not any of said securities or cash have been expended, and if so for what purpose; that if any portion of such securities or cash have been delivered to Central in satisfaction of any alleged indebtedness alleged to be due it by South Western, or otherwise, Central be required to restore such to South Western pending a final determination of all differences between South Western and Central; and for such other and further relief as to the court may seem meet and proper.

South Western and the Central removed this case into this Court upon their petition alleging first that the controversy arises under the laws of the United States and the sum or value in controversy exceeds the sum of $3,000 exclusive of interest and costs and is cognizable in the Federal Courts, and secondly that said suit is a civil action in which it is sought to enjoin, set aside, annul or suspend in whole or in part an order of the Interstate Commerce Commission. Both of these allegations and contentions as to the jurisdiction of this Court are vigorously challenged in the petitioners' motion to remand.

Our first inquiry is: Do we have here an action which "arises under the Constitution, laws or treaties of the United States"? 28 U.S.C. § 1331.

The leading case upon this question is Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 97, 81 L.Ed. 70. The Supreme Court there said: "To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. * * * The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. * * * A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto * * * and the controversy must be disclosed upon the face of the complaint, unassisted by the answer or by the petition for removal. * * * Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense."

In Gully v. First National Bank, supra, the Supreme Court also quoted with approval from their decision in Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 56 L.Ed. 1205, 1210, as follows: " 'A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or

controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends'", and continued: "Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit. The tax here in controversy, if valid as a tax at all, was imposed under the authority of a statute of Mississippi. The federal law did not attempt to impose it or to confer upon the tax collector authority to sue for it. True, the tax, though assessed through the action of the state, must be consistent with the federal statute consenting, subject to restrictions, that such assessments may be made. * * * By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. * * * With no greater reason can it be said to arise thereunder because permitted thereby. * * * The most one can say is that a question of federal law is lurking in the background, just as farther in the background there lurks a question of constitutional law, the question of state power in our federal form of government. A dispute so doubtful and conjectural, so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states."

Two recent district court opinions bring the principles of the Gully v. First National Bank case down to date. In Allen v. Southern Railway Company, D.C.W.D.N.C.1953, 114 F.Supp. 72, 73, non-union employees of the Southern Railway Company brought suit in the state court to enjoin enforcement against them of a union shop contract made between that company and a number of labor unions, which required that employees join the union and pay dues or be dismissed from their positions. The plaintiffs made no mention of any federal statute or of any rights arising out of the Constitution or laws of the United States but asked relief under the laws of North Carolina. The Railway Company in its answer admitted the existence of the union shop contract and pleaded the 1951 amendment to the Railway Labor Act, 45 U.S.C.A. § 152(11) as justification for making same, averring that it entered into the contract unwillingly and because of a threat of a strike of the unions. The unions, on the ground that the case was one arising under the Constitution and laws of the United States, filed a petition for removal to the District Court of the United States. The hearing was upon the petition to remand. The three-judge court through Circuit Judge Parker held that the case had been improperly removed and that the complaint did not set forth a cause of action arising under the Constitution or laws of the United States. Judge Parker wrote as follows:

"The amendment to the Railway Labor Act of which we take judicial notice must unquestionably be considered in passing upon the case; but the complaint states no cause of action arising under that statute, the effect of which is to destroy any cause of action which plaintiff might otherwise have had under state law. In a very similar case where plaintiffs were asking injunctive relief under state law which conflicted with federal laws regulating interstate commerce and the argument was made that the case was removable because it was necessary that federal laws be considered in its decision, the Supreme Court held that the case should have been remanded on the ground that plaintiffs' cause of action did not arise under the federal laws. State of Arkansas v. Kansas & Texas Coal Co., 183 U.S. 185, 190, 22 S.Ct. 47, 49, 46 L.Ed. 144. The Court said:

" 'But even assuming that the bill showed upon its face that the relief sought would be inconsistent with the power to regulate commerce or with regulations established by Congress, or with the 14th Amendment, as contended, it would only demonstrate that the bill could not be maintained at all, and not that the cause

of action arose under the Constitution or laws of the United States.'

"* * * So long as plaintiff's cause of action does not arise under the laws of the United States, the case is not removable, even though when these laws are considered plaintiff has no cause of action and is not entitled to an injunction. The defendant in such case must rely for protection of his rights upon action by the state courts, which are just as much bound as are the federal courts to give effect to the laws of the United States, and in a case involving those laws are subject to review by the Supreme Court of the United States."

The facts in the case of Sandsberry v. Gulf, C. & S. F. Ry. Co., D.C.N.D.Tex. 1953, 114 F.Supp. 834, 837, are essentially the same as in Allen v. Southern Railway Company, supra, except that in the Sandsberry case the plaintiffs brought suit before the union shop contract was signed to prevent its being signed and in their petition took anticipatory notice of the 1951 amendment to the Railway Labor Act "to point out at the outset the plaintiffs' counts against the constitutional validity of said statutory amendment." In sustaining the motions to remand, Judge Dooley said:

"Justice Holmes has said tersely, 'A suit arises under the law that creates the cause of action.' American Well Works Company v. Layne & Bowler Company, 241 U.S. 257, 36 S.Ct. 585, 586, 60 L.Ed. 987. * * * Of course it is easily predictable, although the removing defendants have not yet answered, that the 1951 Amendment will be confronted in the determinations made during the course of this litigation, but clearly that is not enough to predicate Federal jurisdiction. Even if it were a certainty that the plaintiffs' suit must ultimately founder on the rock of said Amendment that still would not affect the question of jurisdiction."

In the light of these authorities and the numerous cases cited therein, it is the opinion of this Court that were it not for the provisions of Title 28, Section 1336 and Section 2321 et sequentia and Title 49 U.S.C.A. § 17(9), the petition would not state a cause of action which arises under the Constitution or laws of the United States, but how stands petitioners' case in view of said provisions and particularly in view of the second inquiry: Is this an "action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission"?

It is abundantly clear that the operating agreement which petitioners seek to cancel was not to take effect, could not take effect, and did not take effect until it was specifically approved by the Interstate Commerce Commission. This is apparent from the resolving clause of the stockholders' resolution of March 11, 1954 and from paragraph 10 of the agreement itself. Moreover, it was stated in oral argument, and not denied, that the Commission had on May 14, 1954, specifically approved the operating agreement. Furthermore, the defensive pleadings filed in this Court on behalf of the two railway companies allege that the operating agreement has been authorized by and approved by the Interstate Commerce Commission under Section 5 of the Interstate Commerce Act, by Interstate Commerce Commission order dated May 14, 1954, Finance Docket No. 18465, in re South Western Railroad operation. As an exhibit to said pleadings, there appears a copy of the report and order of the Commission. The report concludes with the following paragraph:

"Subject to the conditions for the protection of railroad employees referred to, we find that the operation under contract by the Central of Georgia Railway Company of all the properties of the South Western Railroad Company, as described herein, is a transaction within the scope of section 5(2) of the Interstate

Commerce Act, as amended, that the terms and conditions are just and reasonable, and that the transaction will be consistent with the public interest. An appropriate order will be entered."

The order of the Commission is as follows:

"Investigation of the matters and things involved in this proceeding having been made, and said division having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made a part hereof:

"*It is ordered*, That, subject to the conditions for the protection of railroad employees referred to in said report, the operation, under contract by the Central of Georgia Railway Company of all of the properties of the South Western Railroad Company, as described in the report aforesaid, upon the terms and conditions in said report found just and reasonable, be, and it is hereby, approved and authorized."

Petitioners' briefs filed in this Court do not question the defendants' allegations that such approval has been obtained.

The allegations of the petition, construed as they must be with the exhibits attached thereto, convince this Court that petitioners' action is essentially one to enjoin, set aside, annul and suspend the said order of the Interstate Commerce Commission. Such is the effect of the controlling decisions.

Section 5(2) of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 5(2), under which the Central on March 15, 1954, applied to the Commission for approval of the operating agreement provides in part as follows:

"It shall be lawful, with the approval and authorization of the Commission * * * for any carrier, or two or more carriers jointly * * * to * * * contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise * *."

Section 5(11) provides in part as follows:

"The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State."

The report of the Commission in passing upon said application stated in part as follows: "The proposal (operating agreement) is the only feasible method whereby the properties of the South

Western may be operated as a part of the applicant's system which we have heretofore found would be in the public interest." (Exhibit H to answer of South Western and Central.) Pursuant to said report, the Commission entered the above-mentioned order approving and authorizing the operation under the operating agreement.

In the case of Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 42 S.Ct. 349, 351, 66 L.Ed. 671, it was established that a petition may be one to set aside an order of the Interstate Commerce Commission without proclaiming such purpose upon its face. There the plaintiff, Lambert Run Coal Company, sued the Baltimore & Ohio R. Co. in the state court to restrain it from observing its rules in regard to the distribution of coal cars in a time of car shortage. The complaint did not disclose, but rather concealed, the fact that the defendant's rules were the same rules which had been promulgated by the Commission. The Supreme Court said:

"The fact that this was a suit to set aside an order of the Commission did not appear on the face of the bill; but it became apparent as soon as the motion to dismiss was filed. Jurisdiction cannot be effectively acquired by concealing for a time the facts which conclusively establish that it does not exist. As the state court was without jurisdiction over either the subject-matter or the United States, the District Court could not acquire jurisdiction over them by the removal. The jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction. * * * And the vital interest of the United States was one which the plaintiff could neither ignore nor prejudice by indirection. * * * The District Court should

therefore have dismissed the bill as soon as it became apparent that the suit was one to set aside an order of the Commission. * * * And the Circuit Court of Appeals, in remanding the cause to the District Court, should have directed a dismissal for want of jurisdiction and without prejudice."

■ It may be that in the Lambert Run Coal Co. case the Commission's order was mandatory, whereas in the instant case it is permissive only. But it was ruled by the Supreme Court in the later case of Venner v. Michigan Central Railroad Co., 271 U.S. 127, 46 S.Ct. 444, 445, 70 L.Ed. 868, that such a distinction is inconsequential. In the Venner case, a minority stockholder of a railway company sued the company to enjoin it from carrying out an agreement with two other railway companies under which the three companies were to acquire a large number of locomotives by issuing certificates payable over fifteen years. The Commission had made an order approving the agreement and authorizing the acts contemplated therein. The petition alleged that to issue the certificates and provide for their payment in the manner proposed would be in violation of the laws of the state wherein the defendant company was incorporated unless the approval of designated state agencies were secured and that such approval had not been and was not intended to be secured. The Supreme Court said:

"We agree with the court below that the suit is essentially one to annul or set aside the order of the Commission. While the amended bill does not expressly pray that the order be annulled or set aside, it does assail the validity of the order and pray that the defendant company be enjoined from doing what the order specifically authorizes, which is equivalent to asking that the order be adjudged invalid and set aside. Lambert Run Coal Co. v. Baltimore & O. R. Co., 258 U.S. 377, 380, 382, 42 S.Ct. 349, 66 L.Ed. 671 [674, 675]. Such a suit must be brought

against the United States as the representative of the public and may be brought only in a federal district court. * * * That the order is not mandatory, but permissive, makes no difference in this regard. * * * And, as the state court was without jurisdiction, the federal court acquired none by the removal. * * * "

A case very much like ours is State of Louisiana ex rel. Saint v. Morgan's Louisiana & T. R. & S. S. Co., D.C.W.D.La. 1927, 18 F.2d 645, 647, decided by Judge Dawkins and cited earlier herein. That was a suit brought in the state court by the Attorney General, on behalf of the State of Louisiana, to enjoin resident railway companies from leasing their lines to a Texas railway company upon the ground that the lessee planned not to maintain in the State of Louisiana domiciles and main offices for the leased lines as required by state law. In that case, as in ours, it appeared from the petition and its exhibits that the contracts sought to be enjoined would not be made except upon the authority of the Commission. An unimportant difference is that in the State of Louisiana case, the making of the contract was sought to be enjoined before the Commission acted upon the pending application for its approval and authorization, while in our case the Commission had already approved and authorized the contract before the filing of the petition. Judge Dawkins said:

"The effect, therefore, of the writ was 'to enjoin * * * or suspend' an 'order of the Interstate Commerce Commission' by anticipation as effectively as if it had already been entered, for, until the requisite authority was granted, the complaint shows that no lease would be made, and hence no necessity for the injunction. * * * It is argued on behalf of the complainant that, even if the leases should be authorized, the order would be permissive only, and not mandatory. Nevertheless there would exist a conflict between the order of the Commission and the writs of the state courts involving a matter, to wit, the power of the Commission and legality of its order, the determination of which is vested in the federal courts, and in which the United States is a necessary party. * * * The Interstate Commerce Commission alone is vested by Interstate Commerce Act * * * with the power preliminarily to authorize such leases between railroads engaged in interstate commerce. Until it has acted the courts are without jurisdiction to determine the issues thus presented to the Commission."

The Court held, accordingly, that the case had been properly removed to the federal court.

Counsel for petitioners rely upon the case of State of Georgia v. Southern Railway Company, D.C.N.D.Ga.1938, 25 F. Supp. 630, while counsel for defendants commend the reasoning of the Supreme Court of Georgia in the same case. See Southern R. Co. v. State, 188 Ga. 569, 4 S.E.2d 233. The clue to a distinction between the Southern Railway Company case as decided by the District Court and the instant case may be found in the Court's statement of the defendants' contentions: "Defendant claims that the petition, with the allegation with respect to the anticipatory defense, amounts to a cause of action arising under the constitution and laws of the United States and that, as such, is removable to this Court." [25 F.Supp. 631.] It may be that the defendant in that case did not claim, or did not sufficiently impress the court with its claim, that the suit was in substance an action to enjoin or set aside an order of the Interstate Commerce Commission, regardless of whether or not, but for that aspect of the case, it could be said to have arisen under the laws or Constitution of the United States. At any rate, after the case was remanded to the state court and eventually reached the Supreme Court of Georgia, said court ruled that a demurrer raising the question of the jurisdiction

of the state court should have been sustained and significantly said [188 Ga. 569, 4 S.E.2d 237]: "The suit is in purpose and effect an effort to enjoin an order of the Interstate Commerce Commission * * *," and buttressed its views by a thorough analysis of several decisions of the Supreme Court of the United States, including the Lambert Run Coal Co. case and the Venner case.

The views herein expressed are, of course, not at all in conflict with the ruling in the case of Romick v. Bekins Van & Storage Co., Inc., 5 Cir., 1952, 197 F.2d 369, 370, as we understand that case. There stockholders sued their corporation and two directors in the state court to compel declaration of a dividend. Then the case was removed to the federal court. The defendants then filed as plaintiffs in the federal court an original complaint designating as defendants therein the plaintiffs in the previous action and alleged that the plaintiffs in the second suit had acquired certain rights under an order of the Interstate Commerce Commission which authorized them to purchase stock in Bekins Van & Storage Company, Inc., defendant in the first suit, from the corporation and the stockholders thereof including plaintiffs in the first suit. It was further alleged that the plaintiffs in the first suit were interfering with and preventing said plaintiffs, defendants in the first suit, from conforming to said order by illegal and improper acts and specifically by the filing of said first suit. The Court of Appeals held that the first suit was improperly removed from the state court and should have been remanded thereto. The decision was based upon the fact that "The complaint in the state court disclosed no Federal question" and that there was "no fraudulent attempt to evade removal by the plaintiffs in the state court * * *." It does not appear from the Romick case that the plaintiffs' action was essentially one to enjoin, set aside, annul or suspend, in whole or in part, the order of the Commission. Apparently the Court of Appeals was not at all convinced that it was such an action. Moreover, if it were such an action, its true character did not at all appear from the petition or any exhibits attached thereto, and inasmuch as the Court of Appeals saw no fraudulent attempt to evade removal by the plaintiffs in the state court, it necessarily followed that the case should have been remanded.

The Romick case was explained in Produce Terminal Realty Corp. v. New York, N. H. & H. R. Co., D.C.Mass.1953, 116 F.Supp. 451, 454, as follows:

"Neither is this case like Romick v. Bekins Van & Storage Co., 5 Cir., 197 F.2d 369. The complaint there set forth simply an action to compel defendant corporation and its directors to declare certain dividends. Federal law was not necessarily involved until defendants asserted certain rights to stock in the corporation under an order of the Interstate Commerce Commission."

Therefore it is considered, ordered, and adjudged that the motion to remand in this case be, and the same is, denied.

The defendants' motion to dismiss and also the questions of whether any separate and independent cause of action other than the attempt to enjoin, set aside, and annul the Commission's order is stated in the petition, and of whether, if that is so, such cause of action should be retained here, were not fully argued by the parties and are not passed upon at this time.